**FAR EAST MACHINERY CO., LTD., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Atcor, Inc., Sawhill Tubular Div., Cyclops Corp., and Wheatland Tube Corp., Defendant-Intervenors.**

Court No. 87–01–00003.

United States Court of International Trade.

May 19, 1988.

Davis, Wright & Jones, David Simon, Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Jeanne E. Davidson, Washington, D.C., Civ. Div., U.S. Dept. of Justice, for defendant.

Schagrin Associates, Roger B. Schagrin, R. Alan Luberda and Paul W. Jameson, Washington, D.C., for defendant-intervenors.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiff, Far East Machinery Co. (FEMCO), challenges the final results of the first administrative review of an antidumping duty order conducted by the United States Department of Commerce, International Trade Administration (ITA). The primary issue raised by plaintiff's motion for judgment upon ITA's record is whether ITA erred in denying FEMCO's claimed adjustment to United States price for rebated Taiwanese import duties.

## CASE HISTORY

When ITA conducted its original investigation of sales at less than fair value, FEMCO, a Taiwan producer of steel pipe, was not one of the investigated companies. Its imports were nevertheless subject to the antidumping duty deposit rate of 9.7 percent set for "All other manufacturers/producers/exporters" of the covered steel products from Taiwan. *Certain Circular Welded Steel Pipes and Tubes from Taiwan*, 49 Fed.Reg. 19,369 (May 7, 1984) (Antidumping Duty Order). Plaintiff confirmed its participation in ITA's first annual review on November 30, 1984. The review was deemed initiated a year later, 50 Fed.Reg. 48,825, 48,826 (Nov. 27, 1985), under ITA's new rules and at plaintiff's request.[1] Public Record Document (PR) 34.

---

1. Plaintiff requested this first administrative review under ITA's new rules which, in accordance with section 611(a)(2) of the Trade and Tariff Act of 1984, provided for administrative reviews upon request, rather than as a matter of course. 19 C.F.R. §§ 353.53(b) and 353.53a (1987). Although ITA had already begun a review under the previous system, and although the record contains documents received prior to plaintiff's request, ITA considers this review to be at plaintiff's request, pursuant to its new regulations. 50 Fed.Reg. 48,825, 48,826 (Nov. 27, 1985).

ITA then published its preliminary results, finding a margin of 37.76 percent for plaintiff, and stating that "We disallowed a claim for an adjustment for import duty drawback because this claim was insufficiently substantiated." *Certain Circular Welded Steel Pipes and Tubes from Taiwan,* 51 Fed.Reg. 29,954 (Aug. 21, 1986). In the final results, this claim was again disallowed and a margin of 41.22 percent was found. *Certain Circular Welded Steel Pipes and Tubes from Taiwan,* 51 Fed.Reg. 43,946 (Dec. 5, 1986) (final determination). ITA noted that "a significant portion of the margin was due to the inadequacy of FEMCO's submission...." *Id.* at 43,948.

## BACKGROUND

Under U.S. antidumping law generally, ITA may issue an antidumping duty order, after certain findings have been made, upon imported merchandise which is sold (or likely to be sold) in the United States for less than its fair value. 19 U.S.C. § 1673 (1982). Upon request, ITA will conduct an administrative review of its antidumping order, determining the "United States price" and "foreign market value" of each entry of merchandise subject to the antidumping order, and the amount, if any, by which foreign market value exceeds the United States price of entries. 19 U.S.C. §§ 1675, 1677a–1677b (1982 & Supp. IV 1986). That amount is then used as the basis for assessing duties on the examined entries, and collecting deposits of estimated duties on future entries. 19 U.S.C. § 1675.

In determining the United States price of merchandise, ITA begins with the price at which merchandise is exchanged, or agreed to be exchanged, between unrelated parties, and through various additions and reductions, arrives at an amount called "Unit-

ed States price." [2] *PQ Corp. v. United States,* 11 CIT ——, 652 F.Supp. 724, 730 (1987). *See Smith-Corona Group v. United States,* 713 F.2d 1568, 1571–72 (Fed.Cir. 1983) *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). The statutory adjustments to United States price (and to foreign market value) are made "in an attempt to reconstruct the price at a specific, 'common' point in the chain of commerce, so that value can be fairly compared on an equivalent basis." *Smith-Corona,* 713 F.2d at 1571–72.

This case is concerned with one of the adjustments to United States price, often referred to as a duty drawback adjustment, which provides for increasing United States price by

> the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States;

*Id.;* 19 U.S.C. § 1677a(d)(1)(B) (1982). *See* 19 C.F.R. § 353.10(d)(1)(ii) (1987). As with any adjustment which increases United States price, a drawback adjustment can ultimately result in a lowering of dumping margins. This court has interpreted the purpose of a duty drawback adjustment as follows:

> To prevent dumping margins from arising because the exporting country rebates import duties and taxes for raw materials used in exported merchandise, the antidumping law provides for an offsetting adjustment in the calculation of United States price.

*Carlisle Tire & Rubber Co. v. United States,* 10 CIT ——, 634 F.Supp. 419, 424 (1986) (*Carlisle II*). *See* S.Rep. No. 16, 67th Cong., 1st Sess. 12 (1921).[3]

**2.** United States price is a single term used to refer to either of two separate terms, "purchase price" and "exporter's sales price," whichever is appropriate in a particular case. 19 U.S.C. § 1677a(a) (1982). *See PQ Corp. v. United States,* 11 CIT ——, 652 F.Supp. 724, 729–35 (1987).

**3.** This report described the purpose as follows: In order that any drawback given by the country of exportation upon the exportation

of the merchandise ... shall not constitute dumping, it is necessary also to add such items to the purchase price.

　....

... [similarly] the term "exporters sales price" is defined to include such items. *Id.* Although the original provision enacted in 1921 was recodified in 1979 into the Trade Act of 1930, 19 U.S.C. § 1677a(d)(1)(B), the language has remained unchanged.

## DISCUSSION

ITA claims to apply the following two prong test in determining whether to make a drawback adjustment to United States price:

First, that the import duty and rebate are directly linked to, and dependent upon, one another.

Second, that the company claiming the adjustment can demonstrate that there were sufficient imports of imported raw materials to account for the duty drawback received on the exports of the manufactured product.

ITA, Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change 26–27 (Nov. 1985); *Carlisle Tire & Rubber Co. v. United States,* 11 CIT ——, 657 F.Supp. 1287, 1289 (1987) (*Carlisle III*). This court has recently found ITA's application of this test to be in accordance with law. *Carlisle III,* 657 F.Supp. at 1290–91.

The focus of the first part of this test, establishing a link between an import duty and a rebate, is on the drawback program itself, and requires a showing that entitlement to rebates is dependent upon the payment of duties. *See Sorbitol from France,* 47 Fed.Reg. 6,459, 6,460 (Feb. 12, 1982), *aff'd, Roquette Freres v. United States,* 7 CIT 88, 583 F.Supp. 599 (1984) and *Certain Tapered Journal Roller Bearings and Parts Thereof from Italy,* 49 Fed.Reg. 2,278, 2,280 (comment 5) (Jan. 19, 1984) (where rebates may be received absent payments of duties, the fact that the firm under investigation actually paid duties and received a rebate is irrelevant). The second part of the test, demonstrating sufficient imports of imported raw materials to account for the duty drawback received on the exports of the manufactured product, is by its very terms concerned with the specific application of the drawback program to the firm claiming an adjustment. *See Carlisle II,* 634 F.Supp. at 424 and *Carlisle III,* 657 F.Supp. at 1289–90 (ITA must limit duty rebate adjustments to the actual amount of duties imposed). Under this part of the test, ITA has applied "substitution principles" to relieve it of the difficult, if not impossible, task of determining whether the raw materials used in producing the exported merchandise actually came from imported or domestic sources. *Acrylic Film, Strips and Sheets, at Least 0.030 Inch in Thickness from Taiwan,* 49 Fed.Reg. 10,968, 10,972 (Mar. 23, 1984); *Color Television Receivers from Taiwan,* 49 Fed.Reg. 7,628, 7,632 (Mar. 1, 1984) (comment 3); *Steel Wire Rope from the Republic of Korea,* 48 Fed.Reg. 41,615, 41,616 (Sep. 16, 1983) (comment 1).

In this particular case, ITA explained its denial of FEMCO's claimed adjustment in terms of the second part of its test, with the additional requirement that the imported raw materials "must have been appropriate for incorporation into the exported subject merchandise." 51 Fed.Reg. at 43,947.[4]

Initially, plaintiff raised several challenges to ITA's denial of its claimed adjustment, and specifically to ITA's adoption and application of an appropriateness standard, arguing that ITA erred in requiring it to match the exact specifications of its imported coils to those of the exported pipes at issue. Defendant responds that FEMCO failed to meet its burdens of satisfying both prongs of ITA's test, as applied in this case, and that ITA's "assessment of the limited documentation submitted by FEM-

---

4. Specifically, ITA explained its decision on this issue as follows:

While the exporter does not need to show that a certain import was incorporated into a specific shipment of the product to the United States, the imported steel coil must have been appropriate for incorporation into the exported subject merchandise. FEMCO admits that only two types of coil shown on the copies of the import licenses submitted to the Department are used to produce standard pipe. The quantities shown are not sufficient to account

for the exported merchandise. Under the principle of drawback substitution, "we regard drawback claims to be reflective of duties paid on the imported raw material if there is evidence of sufficient imports of that raw material to account for exports of the manufactured product." See *Final Determination of Sales of Less than Fair Value: Acrylic Film, Strip and Sheet, at least 0.030 Inch in Thickness from Taiwan* (49 FR 10968, March 23, 1984).

51 Fed.Reg. at 43,947 (comment 2).

CO in support of its claimed adjustment is entitled to deference." Defendant's Brief at 30. None of the parties have cited any instance in which ITA directly addressed the situation presented in this case—either a specific inquiry by ITA into the appropriateness of imported inputs for incorporation into exported merchandise, or an actual dispute as to whether imported inputs were appropriate for incorporation into any exported merchandise at issue. *But see Stainless Steel Cooking Ware from Taiwan*, 51 Fed.Reg. 42,882 (Nov. 26, 1986) (decided days before ITA's final results in this case and concerning ITA's allowance of a drawback adjustment based upon aggregate, rather than segregated, data on various inputs, each of which was used in manufacturing some, but not all, of the various types of investigated cookware).

At oral argument plaintiff expressed clearly, apparently for the first time, its contention that one of the documents it had submitted to ITA (Attachment F) satisfied the second prong of ITA's test, even if the second prong is construed to include the requirement that imported coil inputs must have been appropriate for incorporation into the exported pipe. Until that time plaintiff had concentrated its arguments on ITA's proof requirements which plaintiff argued were not legally permissible and were inconsistent with ITA's practice in other cases. As it became apparent at oral argument that defendant-intervenors sought application of legal principles which ITA has not expressly adopted here or elsewhere, the court requested clarification and comments from the parties regarding plaintiff's assertion that Attachment F satisfies the standard that ITA has adopted here.

Defendant acknowledged, in its response to the court's request, that "the record indicates that Commerce did not focus upon this document [Attachment F] in reaching its final results," but argued that the document is illegible, and that "FEMCO should not be allowed to cure its deficiencies during the administrative proceedings by its eleventh-hour reliance upon Attachment F during oral argument in this judicial action." Defendant's Statement of Clarification in Response to the Court's Order ("Defendant's Clarification") at 2–3.[5]

From the court's reading of the record, it is apparent that the particular standard ITA applied in its final results did not fully surface until very late in its review. Throughout the earlier portions of ITA's review, neither ITA's requests, FEMCO's responses, nor petitioner's comments, explicitly and unambiguously addressed the issue of establishing both a sufficient quantity, and an appropriate quality, of imported coils, to account for the exported pipe at issue. Defendant points out that "[t]he document trail that FEMCO submitted ... was in effect directed at the first half of the two-part test." Defendant's Brief at 21. The court finds, however, that each of ITA's requests, and all of petitioners' earlier comments, could reasonably be interpreted to relate to the first part of ITA's test—that the import duty and rebate are directly linked to, and dependent upon, one another. If they intended to address the second part of ITA's test, including an appropriateness standard, they failed to adequately express that intention.

ITA instructed FEMCO, in its first direct response to FEMCO's claimed duty drawback adjustment, that it "must tie these inputs to the merchandise that you exported to the U.S." Confidential Record Document (CR) 5, at 2, (ITA deficiency letter).[6]

---

5. The court sees the issue here as whether FEMCO was "deficient" during the administrative proceedings. If it was not, then it is not determinative that plaintiff expressed the reason it was not deficient at oral argument rather than in briefing. Any prejudice to the parties caused by this particular delay was cured by the court's request for clarification.

6. ITA's initial request concerning FEMCO's claim for a drawback adjustment specifically requested the following.

12. Explain "export duty rebate" and "export duty collected" and how you calculated these amounts. Submit a copy of the law that provides for rebates of export duties. If the "export duty rebate" is in fact a duty drawback, submit a copy of the statutes and regulations that require an import duty on raw materials that are used to manufacture pipe and tube. (You must tie these inputs to the merchandise that you exported to the U.S.).
CR 5, at 2.

ITA later acknowledged that this first request "was subject to differing interpretations." 51 Fed.Reg. at 43,947. It initially denied FEMCO's claimed adjustment, stating simply that it was "insufficiently substantiated." 51 Fed.Reg. at 29,954. Although other statements by ITA and petitioners were more specific, they appeared to solicit further documentation of the first part of ITA's test, rather than the second part, of ITA's test. CR 9 and 11.[7]

FEMCO responded by submitting evidence which it characterized as "a complete documentary chain establishing Femco's entitlement to and receipt of a duty drawback, and hence entitlement to a duty drawback adjustment under US dumping law." CR 12, at 9 (Aug. 26, 1986). FEMCO later stated that it believed that this August "submission was requested and intended to give an *example* of a duty drawback claim and receipt." CR 16, at 4. Apparently, ITA did not realize this at the time, and in denying the duty drawback adjustment, it ultimately relied on the August submission, and FEMCO's characterization of that submission, as understood by ITA. 51 Fed.Reg. at 43,947. *See infra* note 10. Whatever the purpose was of the August submission, it was not the only evidence of record ITA ultimately had before it relating to the crucial issue.

After having generously extended its deadlines several times, ITA finally announced that FEMCO "must supply a record of the cost of the imported coil which was eligible for duty drawback including invoices and purchase orders. This information will only be used as part of the record for this first administrative review if it is submitted on or before September 29, 1986." PR 100 (Letter of September

22, 1986). Plaintiff made its final submission of documentation on September 29, 1986, which contained among other things, the disputed Attachment F. CR 14.

It was only at this point, ITA's final deadline for the submission of information to be used in its final results, that the parties began to articulate their present positions explicitly and unambiguously. FEMCO's September 29 submission, and petitioners' comment (on FEMCO's August submission), also dated September 29, 1986, each raised issues relating to drawback substitution, apparently for the first time. Petitioners argued that the imported coils documented in FEMCO's August submission were of an inappropriate type for producing the exported pipe at issue, that FEMCO never stated for the record whether it actually used imported coil in producing its exported pipe, and that even if it used domestically produced coil, "[n]o acceptable theory of substitution would allow FEMCO to claim a drawback when the imports upon which the claim is based could not be used to produce the merchandise exported." CR 13, at 9. FEMCO in turn described its September 29 submissions as including "invoices for steel coil used as input for the type of pipe exported to the United States on which Femco claims duty drawback," CR 14, at 3. FEMCO further explained that "[o]f the various types of coil shown in these invoices and import licenses, [ ] and [ ] are used for the production of standard pipe," *id.* at 8, and that

Taiwan has a substitution drawback system, similar to that for the United States, and the exporter is not required to physically trace from the coil input to the pipe

7. Petitioners argued on June 24, 1986, that FEMCO's claim should be denied until it can verify its drawback claim by providing a certification of the raw material linked to a specific entry, a copy of the export declaration for the pipe and tube and a copy of an approved application which ties together the other two documents.

CR 9, at 10.

On the same day as ITA issued its preliminary determination, disallowing FEMCO's claimed drawback adjustment as "insufficiently substantiated," an ITA memo to the file stated that:

If, in fact, the government allowance given to FEMCO upon export of the merchandise was a duty drawback, FEMCO should have been able to calculate on a sale by sale basis the exact amount rebated by referring to the applications submitted to the government and the rebate received. However, FEMCO has only reported a[n] average and there is no way of telling what part was a duty drawback and what was some other subsidy given by the Taiwanese government for the export of steel products.

CR 11, at 3.

output. Therefore, it is not possible to identify these, or indeed any other, particular coil imports as the actual coil which was used in the production of the pipe in question.

*Id.*

Petitioners' subsequent response to FEMCO's September 29 submission explicitly developed the standard, and its basis, which was ultimately adopted by ITA in its final results. Specifically, in that response, dated October 7, 1986, petitioners cited ITA determinations as support for the proposition that "a foreign producer must have imported enough of the input for which drawback is claimed to cover all its exports of the finished product for the drawback claim to be viewed as reasonable." CR 15, at 3 (citing *Steel Wire Rope from Korea,* 48 Fed.Reg. 41615 (September 16, 1983) and *Acrylic Film, Strips and Sheets, at Least 0.030 Inch in Thickness from Taiwan,* 49 Fed.Reg. 10968 (March 23, 1984)). From this proposition, petitioners developed and articulated the following argument:

> Implicit in this position is the requirement that the input product upon which the claim is based is capable of being used in the production of the exported product. No qualitative difference exists between claiming a drawback when there are not enough imported inputs to produce the exported goods on which the drawback is claimed and claiming a drawback on inputs that were not intended for use in and could not have been used to produce such or similar merchandise to that under investigation. In both cases, a drawback is being claimed for raw material which is not the functional equivalent of the imported, duty-paid input necessary to create the exported product.

**8.** Prior cases, which did not define the standard used here, may be distinguishable on the basis that appropriateness was never raised as an issue.

**9.** As petitioners were the party that articulated the appropriateness requirement, after the ability to affect the record was closed to FEMCO, it is understandable that plaintiff did not point out

CR 15, at 3–4 (letter dated October 7, 1986). *See* 51 Fed.Reg. at 43,947 (comment 2).

Absent ITA's identification of this standard on any earlier occasion in this or any other case, petitioners' development of this standard, after the record was closed to submissions of documentation, failed to put plaintiff on notice of what was required of it. This is the case regardless of whether ITA chooses to treat "appropriateness" as a general requirement which respondents must satisfy in each case, or whether it only inquires into appropriateness where it is actually in dispute.[8] Having chosen to adopt a standard, or consider a specific challenge, at such a late point in the review, ITA should have at least taken care to determine whether FEMCO's prior submissions might nevertheless meet this burden.

Attachment F, upon which plaintiff now relies, was submitted within ITA's deadline. The relevance of this document was brought to ITA's attention, in part by FEMCO, but most directly by petitioners, within days of the submission of Attachment F by FEMCO.[9] Specifically, petitioners singled out Attachment F as the only arguably relevant documentation in the record:

> In fact, FEMCO's letter of September 29 was the first time in this case that it has provided the Department with information that it imported any coils which could have been used in the production of standard pipe under 4.5 inches. *See* FEMCO letter of September 29, 1986 at Att. F. The only information on the record indicates that FEMCO imported [ ] metric tons of coil which could have been used in the production of the exported pipe. *Id.*

CR 15, at 4 (letter dated October 7, 1986). In so doing, petitioners acknowledged that Attachment F documented a certain quanti-

to ITA in its final submission that Attachment F satisfied the as yet unknown standard. Furthermore, after petitioners specifically pointed out the relevance of Attachment F to the issue it raised, there was no reason why FEMCO should have moved to open the record to say the same thing.

ty of coils which petitioners conceded were of the appropriate types for producing the exported pipe at issue. *Id.* They even acknowledged, in numbers, that this quantity exceeded the quantity of exports of the investigated pipe to the United States. *Id.* They then went on to argue that, in determining whether the quantities set forth in Attachment F are sufficient, ITA should compare them to FEMCO's worldwide, rather than U.S., exports of pipe. *Id.* ITA never addressed this argument in its final results.

Thus, it is apparent that neither the relevant standard, nor proof, was explicitly presented in this case until the eleventh hour of ITA's review. Although ITA adopted petitioners' recently articulated standard in its final determination, it failed to apply that standard to the only concededly relevant documentation of imported coil—Attachment F—or address petitioners' legal arguments concerning that document. Instead, although it allowed the September 29, 1986, submission, ITA

focused its determination on FEMCO's August submission and relied upon narrow interpretations of certain statements made by FEMCO.[10]

Under the particular circumstances of this case, the court does not agree that ITA "had no reason to consider this particular document in its final results." Defendant's Clarification, at 9. As "the record indicates that Commerce did not focus upon this document in reaching its final results," *id.* at 2, the court cannot find that ITA's denial of FEMCO's claimed drawback adjustment is supported by substantial evidence in the record and is in accordance with law.[11]

Accordingly, the matter is remanded to ITA for consideration of the evidence in the record, including FEMCO's September 29, 1986, submission, and in particular, Attachment F. Furthermore, as defendant-intervenors have raised the possibility of another new standard, and as the entire history of this proceeding has included a long series of misunderstandings, ITA should make

**10.** ITA explained its conclusion that FEMCO had failed to demonstrate sufficient quantities upon the following grounds:

> FEMCO admits that only two types of coil shown on the copies of the import licenses submitted to the Department are used to produce standard pipe. The quantities shown are not sufficient to account for the exported merchandise.
>
> .    .    .    .    .
>
> FEMCO reveal[ed] that the August 27, 1986 submission documented drawback for only one U.S. sale. The single "example" supplied is not sufficient substantiation of the claimed duty drawback adjustment.

51 Fed.Reg. at 43,947 (comments 2 and 5). The first statement is part of ITA's response to comment 2, which concerns the documentary evidence contained in FEMCO's August submission. FEMCO's "admission," however, appears to refer to its statement that: "Of the various types of coil shown in *these* invoices and import licenses, [ ] and [ ] are used for the production of standard pipe." CR 14, at 8 (emphasis added, bracketed material omitted). This statement is contained in FEMCO's September 29, 1986, submission and follows references to invoices contained in attachments D and F. CR 14, at 7. It is difficult to understand how ITA could conclude that "the quantities shown are not sufficient to account for the exported merchandise" 51 Fed.Reg. at 43,947, if it "did not focus upon this document [Attachment F] in reaching its final results." Defendant's Clarification at 2.

The second quoted portion of ITA's results is expressly concerned with FEMCO's characterization of its August submission. This does not indicate, one way or the other, whether FEMCO's subsequent September 29, 1986, submission demonstrated sufficient quantities of appropriate coil.

**11.** Defendant argues that "Even if this action were remanded to Commerce for further consideration, however, it is unclear from the face of the document due to its illegibility whether Attachment F satisfies the requirements for a duty drawback adjustment. Defendant's Clarification at 2–3. Whether or not this document actually satisfies ITA's requirements is a determination which the court leaves to ITA upon remand. The court notes, however, that the copy as it existed at the time of its submission was sufficiently legible for petitioners to acknowledge its relevance. In addition, defendant does not argue that the fact that the record was closed for further documentation on the day Attachment F was submitted should prevent it from requesting a more legible version. Defendant only argues that "Because FEMCO submitted Attachment F to Commerce at the last possible moment, and failed to explain its purported significance, Commerce had no reason to request further clarification or to request that FEMCO submit the original document." *Id.* at 3.

clear exactly what the record must establish in order to substantiate a drawback adjustment. If ITA views the record in light of standards which FEMCO could not reasonably have perceived to be applicable at the time of its submissions of documentation, ITA shall give FEMCO an opportunity upon remand to meet that standard with submissions of additional documentation. Since ITA's actions upon remand may render certain legal arguments raised by plaintiff moot and may clarify its view of defendant-intervenors' other objections to the adjustment, the court will address any remaining relevant arguments that the parties wish to pursue after ITA's remand. ITA shall report its results in 30 days.

SO ORDERED.