The ASOCIACION COLOMBIANA de
EXPORTADORES de FLORES, et
al., Plaintiffs,

v.

The UNITED STATES, et al.,
Defendants.

Court No. 87–04–00622.

United States Court of
International Trade.

Jan. 6, 1989.

Heron, Burchette, Ruckert & Rothwell, Thomas A. Rothwell, Jr., James M. Lyons, Joseph A. Vicario, Jr., Washington, D.C., and Alfred G. Scholle, for Asociacion Colombiana de Exportadores de Flores.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., Jeanne E. Davidson, Civ. Div., U.S. Dept. of Justice, Anne W. White, Office of the Chief Counsel, for Import Admin., U.S. Dept. of Commerce for the U.S.

Stewart & Stewart, Terence P. Stewart and James R. Cannon, Jr., Washington, D.C., for Floral Trade Council of Davis, California.

## Table of Contents

| | Page |
|---|---|
| I. FTC CHALLENGES | 1116 |
|   A. United States Price Issues | 1116 |
|     1. Monthly Averaging | 1116 |
|     2. U.S. Price Data of Flores Timana (Timana) | 1116 |
|     3. U.S. Price Data of Floramerica | 1117 |
|   B. Foreign Market Value Issues | 1117 |
|     1. Cost of Production or Constructed Value of Timana, Flores La Pampa (La Pampa) and Flores de Universal (Uniflor) | 1117 |
|       a. Cull Value at Timana and La Pampa | 1117 |
|       b. 1986 Material Costs for Timana, La Pampa and Uniflor | 1118 |

|  |  | Page |
|---|---|---|
| 2. | Capitalization of Propagation Costs | 1119 |
| 3. | Interest Credit at Flores Esmeralda | 1119 |
| 4. | Adjustment of Constructed Value for Differences Between Selling Expenses in the Home Market Sales and in the U.S. Market | 1119 |

| | | | Page |
|---|---|---|---|
| II. | ASOCOLFLORES' CHALLENGES | | 1120 |
| | A. | Scope of the Antidumping Laws | 1120 |
| | B. | Sampling | 1120 |
| | C. | Foreign Market Value Issues | 1122 |
| | | 1. Floramerica's Claim to an Exporter's Sales Price Offset | 1122 |
| | | 2. Use of Third Country Prices in General | 1124 |
| | | 3. Use of Both Constructed Value and Third Country Sales for Foreign Market Value | 1124 |
| | | 4. Exclusion of Certain Flores Del Rio (Del Rio) Sales in Calculating Third Country Price | 1125 |
| | | 5. Cost of Production, Treatment of Culls | 1125 |
| | | a. Allocation of Production Costs to Culls | 1125 |
| | | b. Uniflor's Cull Credit | 1125 |
| | D. | U.S. Price Issues | 1125 |
| | | 1. U.S. Price Deduction for Customer Credits | 1125 |
| | | 2. Non-payment by Uniflor's Customers | 1125 |
| | E. | Uniflor's Rate as Best Information Otherwise Available | 1126 |
| Conclusion | | | 1126 |

OPINION

RESTANI, Judge:

This consolidated case is before the court on cross-motions for summary judgment based on the agency record. Both the foreign producers and the domestic industry challenge the final affirmative antidumping determination of the International Trade Administration (ITA) in *Certain Fresh Cut Flowers from Colombia*, 52 Fed.Reg. 6842 (1987), as amended, 52 Fed.Reg. 8492 (1987).[1] The parties have managed to reduce the issues in this case to approximately two dozen. For the sake of brevity and because the standards of review and definitions of applicable statutory terms are well known, they will not be repeated here.[2] The court will begin by addressing the challenges of the domestic industry party, the Floral Trade Council of Davis, California (FTC or Petitioner).

I. FTC CHALLENGES

A. *United States Price Issues*

1. Monthly Averaging

■ FTC's most far-reaching challenge is to ITA's averaging of United States prices on a monthly basis. The court has approved ITA's adoption of this averaging methodology as to related flower investigations. There are no facts of record here which would alter that conclusion. *See Floral Trade Council of Davis, California v. United States*, 12 CIT ——, 704 F.Supp. 233 (1988) (containing complete discussion of the court's reasons for approval of monthly averaging in the related cases).

2. U.S. Price Data of Flores Timana (Timana)

■ FTC asserts that ITA did not verify certain information provided by the Colombian producer known as Timana, and therefore, ITA may not rely on data submitted by Timana. *See* 19 U.S.C. § 1677e(a) (1982 & Supp. IV 1986 which (requiring verification of data relied on by the agency and permitting use of "best information avail-

---

**1.** Because of a multiple domestic industry finding by the International Trade Commission (ITC) during its injury investigation, margins were recalculated.

**2.** Citations to the public record are designated "AR." Citations to the confidential record are designated "CR."

able" in the absence of such verifiable data). Specifically, FTC objects to Timana's claim that its sales for export to the United States were at certain prices, while various invoices and export licenses revealed lower U.S. prices. ITA determined, by reference to bank deposit records and accounting information obtained from Timana, that Timana's U.S. prices were as claimed by Timana.

ITA is not required to accept information contained in invoices or export licenses at face value if ITA determines, based on other evidence of record, that a different price was paid. FTC claims that the chain of evidence demonstrating the higher U.S. prices was not sufficiently linked. The court finds ITA could reasonably come to the opposite conclusion based on the data obtained by ITA, in conjunction with the plausible explanation presented by Timana as to the why the price discrepancy occurred.[3] The court finds, therefore, that Timana's U.S. price response was adequately verified, and that there was no failure of verification requiring use of other information.

### 3. U.S. Price Data of Floramerica

■ FTC also objects to ITA's lack of verification of sales for export to the United States made by Caribbean Flowers, a sales arm of the producer Floramerica.[4] Caribbean Flowers sold flowers produced by independent growers. ITA stated that the independent producers knew that the sales made through Caribbean were for export and merely used Caribbean as a freight forwarder. If this were the situation, the producers would have been proper respondents, assuming they had been included in the sample of producers which ITA was investigating, which they were not. *See, infra,* section II B. at 13. ITA did, however, verify Floramerica's reported volume of U.S. sales. FTC's statement that Floramerica could have hidden less than fair value (LTFV) sales by improperly denominating such sales "Caribbean Flow-

er Sales" is mere speculation. Speculation is not support for a finding of failure to verify.

### B. *Foreign Market Value Issues*

1. Cost of Production or Constructed Value at Timana, Flores La Pampa (La Pampa) and Flores de Universal (Uniflor)

   a. *Cull Value at Timana and La Pampa*

■ ITA calculated foreign market value by using certain producers' or sellers' cost of production as constructed value where there were insufficient above cost home market or third country sales of export quality flowers. *See* 19 U.S.C. § 1677b(a)(2) and (e) (1982 & Supp. IV 1986). Apparently this situation existed with regard to all flowers at Timana and Uniflor. 52 Fed.Reg. at 6844, 6848 (comment 36). An investigation as to whether sales of standard carnations on which foreign market value might be based were below cost of production and thus unusable was conducted as to La Pampa, among others. *See* 19 U.S.C. § 1677b(b) (1982); 52 Fed.Reg. at 6844. La Pampa's sales of standard carnations were found to be above cost of production. *Id.*

Once again, FTC alleges Timana failed verification, and that all of Timana's data must be rejected. The court finds that FTC has not demonstrated that ITA abused its discretion in using Timana's cost data, where it was available. Defects in data which are minimal do not result in failure of verification requiring use of best information available in place of all of the respondent's data. In this particular case the industry, as a general practice, does not maintain data of the type sought by ITA, thus ITA could properly use estimates as to the limited data which was unavailable.

Based on estimates, respondents were allowed a credit against cost of production for the value of substandard merchandise

---

**3.** A more detailed description of the circumstances involved is found in the confidential briefs filed in this matter.

**4.** "Floramerica," as used here, refers to both an amalgam of three interrelated Colombian growers, and one of the three growers.

which was sold in the local market. The reason for selection of the particular estimates of the value of sales of substandard or "cull" merchandise for La Pampa and Timana, however, was not clearly explained, even in supplemental briefing.[5] Both Timana and La Pampa claimed little cull value, yet ITA used estimates for Timana and La Pampa which were quite high in comparison with the rates apparently assigned to some firms. In its determination, ITA asserts that it used an average of verified data if a substantially complying respondent did not provide specific data for a certain category. 52 Fed.Reg. at 6845 (comment 2). As to Timana, rather than using an average of the cull values attributed to other firms, ITA used a favorable rate "in line" with that of a specific company. In its supplemental brief, ITA has not explained why it did not do what is described in the determination. Respondents lacking data should not be preferred over those fully complying with ITA's request, nor should petitioner be penalized for a respondent's lack of data. ITA may have a good reason for selecting another firm's cull value data to be used to fill in Timana's data. If so, that has not yet been explained. Unless such reason is compelling, at this stage ITA should do as it stated it had done and use average values for this information. A similar problem exists with regard to La Pampa.

b. *1986 Material Costs for Timana, La Pampa and Uniflor*

Because Timana had completed only its 1985 inventory at the time of ITA's request, no verifiable 1986 data on material costs was available. ITA allegedly allocated a material cost to the first five months of 1986 based on Timana's verified costs for the corresponding 1985 period. *See* 52 Fed.Reg. at 6848. In post-argument briefs, ITA admitted it mistakenly used data from a non-corresponding period to estimate 1986 costs for Timana. ITA should correct its error in such a way as to account for fluctuating yearly costs and to account for any likely increases revealed by record evidence as to other producers. For example, if 1986 costs were generally reported by other producers to be higher for the 1986 period, an estimated average increase for 1986 could be added. This would be consistent with the statement that averages would be used for missing data. FTC makes similar complaints as to La Pampa. The methodology for La Pampa should be the same as described here for Timana.

Uniflor, a seller of miniature and standard carnations, was assigned a cost of materials figure for 1986 based upon verified 1985 cost data plus Uniflor's own estimate of a percentage increase for 1986. Any unverifiable 1986 increase figure should not be used if it is lower than the average of verifiable 1986 increases over 1985 costs. To do so would be an improper use of best information available.

In general, ITA has to draw a balance when information is not made available by the respondent or is otherwise not verifiable. ITA leaned one way when it decided to accept *some* data from the respondents. As indicated, this was reasonable as ITA justifiably found substantial compliance. In order to achieve a fair balance, however, ITA has to lean back the other way somewhat to avoid improperly favoring respondents as to the missing information. ITA can reach the balance in several ways. In this case, it claimed it would use an average of data from other sources. This would appear to be one acceptable choice for substantially complying respondents. In other cases, ITA may have reason to use data less favorable to respondents. This could be particularly true where ITA is uncertain as to whether a respondent could have provided the missing data. What ITA should not do is assign particularly favorable data to respondents if more neutral data is available.

---

5. Plaintiff has made a vague allegation regarding Uniflor's cull value offset to cost. The verification report shows that a credit was calculated using, in part, a cash sale journal ledger. The final determination at Respondents' comment 39 indicates sales receipts were also used. 52 Fed.Reg. at 6852. FTC has not demonstrated that any significant error occurred. *See also, infra,* discussion of Asocolflores' challenge to Uniflor's cull value offset.

### 2. Capitalization of Propagation Costs

■ FTC objects that ITA erred in calculating cost of production by relying on current expense data regarding propagation costs at Floramerica. According to FTC, such method inadequately accounted for propagation costs incurred in earlier years for the flowers sold in the review period. Floramerica did not capitalize its costs, but ITA in making its calculations assumed that propagation costs were continuous so that utilization of current expense data would approximate the results of capitalization.

Apparently, the major source of disagreement between ITA and FTC involves carnation production,[6] because carnations have a life span of two years. FTC argues that ITA did not know if the current expense data was usable because ITA failed to determine if all plants were replaced every two years or whether half were replaced every year. ITA states that despite the time periods needed for the plants to become useful, production was stable. FTC counters that disease or weather could have caused production not to increase.[7] This is mere speculation. Reasonable business practice would require planting that resulted in stable production on a yearly basis. The record showed that production was stable. The court finds that ITA did take a somewhat broad approach on this issue but its conclusion is sufficiently supported.

### 3. Interest Credit at Flores Esmeralda

FTC objects that ITA improperly allowed Flores Esmeralda a short term interest credit in its cost calculation. FTC argues that ITA did not ascertain whether the interest earned was actually derived from current cash flow. Neither ITA's determination nor defendant's supplemental brief with regard to interest income was sufficient to explain why ITA states that the substantial figure for interest income accepted as a credit was actually based on interest arising from current operations. No citation to evidence of record was made indicating that the interest was earned on a "temporary short term investment related to current company operations." Defendant's Supplemental Brief at 4. Thus, the court cannot determine whether, in this case, the investment income which was netted against interest expense was related to current operations. Defendant also failed to provide as requested a general explanation as to if, or in what circumstances, interest credits and expenses are netted rather than allowing interest income as an offset up to the amount of interest expense. None of the past administrative cases cited by the parties on this point is clear as to past practice. The statement in *Erasable Programmable Read Only Memories (EPROMs) from Japan*, 51 Fed. Reg. 39,680, 39,684 (Oct. 30, 1986), cited by defendant is particularly confusing. The rationale and factual basis for ITA's determination on this issue have yet to be revealed.

### 4. Adjustment of Constructed Value for Differences Between Selling Expenses in the Home Market Sales and in the U.S. Market

■ In its determination, ITA applied 19 C.F.R. § 353.15 (1988) to reach a fair comparison between U.S. and home market sales by deducting from constructed value specific United States selling expenses. This methodology has been found to be reasonable and necessary under 19 U.S.C. § 1677b(a)(4) (1982 & Supp. IV 1986). *See The Timken Co. v. United States*, 11 CIT ——, 673 F.Supp. 495, 507–8 (1987). Constructed value is one way of arriving at foreign market value. According to *Timken*, once basic foreign market value has been calculated by any method, that is,

---

**6.** Foreign market value for sales of standard carnations by Floramerica was calculated based on third country prices, but cost remains relevant because of plaintiff's assertion that substantial sales were at less than cost. This would require, under certain conditions, the use of cost based constructed value for foreign value calculation purposes. *See* 19 U.S.C. § 1677b(b) (1982).

**7.** Evidence of record indicates that Floramerica did not have disease problems and also had substantial propagation costs in the years of concern.

home market sales, third country sales, or constructed value, it should be adjusted for differences between conditions in the home market or in the surrogate market and conditions in the United States, in order to achieve a fair comparison. This court has been presented no convincing reason why *Timken* should not be followed.[8]

The court will next address the challenges of the various foreign producers. The lead plaintiff in these consolidated actions is known as Asocolflores. It is a trade association. Although FTC is also a plaintiff in this consolidated action, the court will refer to the various producers or exporters generally as "plaintiffs" or "Asocolflores."

## II. ASOCOLFLORES' CHALLENGES

### A. *Scope of the Antidumping Laws*

█ Asocolflores makes a general argument that the fresh-cut flower industry operates in such a manner that any dumping is in essence "technical," and that Congress did not intend for duties to be imposed in such a situation. Asocolflores' arguments lead the court to conclude that four factors are to be considered: the cyclical nature of the industry, the perishability of the merchandise, the lack of a developed home market, and the consignment basis of many of the U.S. sales at issue.

In response to plaintiffs' arguments regarding cyclical value and perishability, the court finds that ITA made ample effort to adjust its computations to account for the yearly cycle and the perishability of the merchandise at issue. *See* discussion of averaging in *Floral Trade Council of Davis, California v. United States*, 12 CIT ——, 704 F.Supp. 233 (1988). ITA's ap-

proach was broad enough to eliminate, to a reasonable degree, the potential that an investigation of this industry would result unfairly in an affirmative finding because of "necessary" low priced sales.[9]

In response to Asocolflores' comments regarding the lack of a "genuine home market," the court finds that Congress specifically provided a method for dealing with lack of home market sales in 19 U.S.C. § 1677b(a) (1982 & Supp. IV 1986). Thus, Congress' intent appears to be that the antidumping laws should apply in such circumstances as these.

Lastly, Asocolflores notes the existence of consignment sales, the prices of which are not directly controlled by the producers. The argument is that in view of the other factors and this lack of control, it is clear that the producers do not intend to dump their merchandise. The antidumping laws, however, do not make producers' intent determinative. *See USX v. United States*, 12 CIT ——, 682 F.Supp. 60, 68 (1988). Furthermore, all U.S. sales, whether made pursuant to consignment agreements, fixed priced contracts or otherwise, except for certain inapplicable exceptions, are to be included in margin calculations.[10] This enables the full effect of unfair pricing to be counteracted. Producers are not entitled to an exemption from the antidumping laws merely because they put pricing outside their direct control. Whether the factors discussed here are considered together or separately, plaintiffs are not entitled to an overall negative determination.

### B. *Sampling*

█ Asocolflores alleges that ITA's sampling techniques were defective. During

---

8. The court does not reach the issue of whether an adjustment which brings the general expense aspect of constructed value below the statutory minimum as set forth in 19 U.S.C. § 1677b(e) is permissible as plaintiff did not demonstrate that this occurred here. *But see Timken*, which appears to approve the full circumstances of sale adjustment. 673 F.Supp. at 508 n. 21.

9. The court finds without merit Asocolflores' argument that monthly averaging on a per consignee, as opposed to a per producer or export-

er, basis, undermines the rationale for ITA's approach.

10. Note that the definition of exporter, applicable to exporters' sales price transactions for U.S. price purposes, which is found in 19 U.S.C. § 1677(13) (1982) refers to agents of producers. That this term includes consignment agents is confirmed by the legislative history of the Antidumping Act of 1921. *See* Hearing on H.R. 2435 before the Senate Finance Committee, 67th Cong., 1st Sess. at 42–43 (1921).

the administrative proceedings, Asocolflores suggested a list of eighteen producers which it believed should be investigated. These producers were responsible for sixty percent of imports. Investigation of the eighteen largest producers would have reflected ITA's traditional method of investigation. *See* 19 C.F.R. § 353.38(a) (1988). In this case, however, ITA decided that sampling was required because of the large number of transactions involved, but more importantly, because the Colombian industry was composed of numerous small producers. Sampling is specifically authorized by 19 U.S.C. § 1677f–1(a) (Supp. IV 1986). The parties do not dispute that the first statutory requirement was met, that is, that sampling be used only if a significant number of transactions (or adjustments) are involved. *Id.* The second requirement under the statute is that the type of sampling employed yield representative results. *See* § 1677f–1(b). This is the subject of dispute.

In the case of an industry composed of numerous small producers some type of random sampling may be the preferred approach. *Cf. Fabricas El Carmen, S.A. v. United States,* 11 CIT ——, 672 F.Supp. 1465, 1479 n. 25 (1987) remand order vacated as moot 12 CIT ——, 680 F.Supp. 1577 (1988). (Fabricas is distinguishable because it involves country-wide countervailing duty rates; the court, however, expressed concern about ITA's traditional methodology for industries composed of numerous small firms, which methodology the court viewed as a type of non-random sampling.) ITA's sample in the case at hand resulted in the investigation of one large exporter and about eleven smaller ones.[11] This is approximately the ratio of large to small firms in Colombia, overall. Furthermore, each flower type involved in the investigation was covered by the sample.

Asocolflores' main complaints seem to be that too few large exporters were included in the sample and that a stratified sampling technique should have been employed.[12] Plaintiffs requested stratification according to the size of the producer, but some of their arguments imply that stratification by type of flower produced is also sought. Plaintiffs' desire for one or more types of stratified sampling is not a sufficient basis for objection to ITA's methodology. ITA performed an acceptable random sample. A stratified sample is merely a special type of random sample which may be constructed when the investigator has a degree of prior knowledge about the universe to be sampled. J. Freund, *Modern Elementary Statistics* 217 (5th Ed.1979). There is no requirement that a stratified sample be used, particularly when it would require ITA to conduct a substantial pre-investigation.

Asocolflores also argues that a report by economists which it hired demonstrates that certain producers included in the sample were not representative of the group. Costs are alleged to be abnormally high or other factors are said to make the firms unsuitable for inclusion in the sample. Perhaps if ITA had unlimited time it would have chosen a broader sample or would have kept resampling until its selection satisfied even the most stringent standards. ITA, however, has very limited time in which to conduct its investigations. None of the characteristics attributed to the producers which Asocolflores wishes eliminat-

**11.** Other producers volunteered for investigation, but were not included in the sample for purposes of calculating an "all other rate." ITA properly refused to add to or subtract from the sample for purposes of constructing an all other rate. ITA properly included in its all other rate best information rates for companies selected for the sample who did not respond to questionnaires. Respondents must answer; ITA must be in a position to judge who is properly covered by the investigation. Respondents may not make that choice. In a random sampling situation, to exclude such non-responding companies from the all other rate would undermine the overall methodology. This case is distinguishable from non-random sampling cases on this point.

**12.** Plaintiffs' other suggestion of a sampling of *sales,* as opposed to producers, is not feasible. ITA's investigations focus on producers. Sampling of sales in this case would lead to a burdensome number of verifications because the number of producers involved would not be reduced significantly.

ed seem out of the ordinary for an agricultural industry composed of numerous small producers and some large ones. Furthermore, one small producer with high costs does not seriously skew the sample to plaintiffs' detriment when a weighted margin is used. In such a case, the low rate attributed to the large producer, or producers, dominates.

In addition, the court finds no disruption to the sample merely because of required recalculations following ITC's determination. In hindsight, it would have been better had ITA stratified per flower type because of ITC's multiple industry finding based on flower type. ITA, however, cannot be held to foresee what ITC's decisions will be. ITC's determinations address different questions and are based on different standards. ITA's sample was not perfectly suited to the final shape of the order, but the sampling methodology was legally adequate and the results of the sampling have not been shown to be unrepresentative.

### C. *Foreign Market Value Issues*

  1. Floramerica's Claim to an Exporter's Sales Price Offset

■ Floramerica claims that its indirect selling expenses in the home market should offset the deduction to exporter's sales price (ESP) for selling expenses in the United States.[13] 19 C.F.R. § 353.15(c) (1988) permits such an offset. *See also Smith–Corona Group v. United States*, 713 F.2d 1568 (Fed.Cir.1983). In order to obtain the offset the claimant must document actual selling expenses in the home market.

As indicated, Floramerica is actually three interrelated Colombian companies— Floramerica, Jardines de Colombia and Cultivas del Caribe. Company X is a related Panamanian company which acts as a distributor for the Colombian Floramerica companies. Other related sales entities are Sunburst Farms, Inc. of Miami, Florida and Sun Petals, both of which market flowers in North America, and Sunburst Holland, which markets flowers in Germany. Sales

to Sunburst Miami are made through Company X which purchases the Colombian flowers on a fixed price basis. Sunburst Holland makes sales and then places orders with the Floramerican Colombian companies which then distributes them through Company X to Sunburst Holland.

Asocolflores' complaint is that ITA allowed an offset for selling expenses incurred by the two Sunburst companies but neglected the offset for Company X's expenses which had been included in the reduction to ESP. It appears clear from the submissions that had ITA known, at the time it made its determination, all of the facts that are now so clearly described, that it would have granted a larger offset than it did.

To the court, the question is whether ITA acted reasonably in relying on certain statements of the respondent when it made its foreign market value calculation excluding X's expenses. If ITA acted reasonably, the court will not force a recalculation. To do so under such conditions would undermine the finality of these determinations. As much as the court would like determinations to reflect reality, those determinations should not be judged on the basis of later acquired information about reality. This would be akin to deciding a case on matters outside the record.

A review of the history of the investigation vis-à-vis Floramerica is necessary to an understanding of this matter. Floramerica's first questionnaire response on September 10, 1986 contained very little useful information from which to calculate an ESP offset. *See* AR 65 and CR 19. Totals for selling expenses are included but descriptive information is not. Deficiencies in questionnaire responses are not unexpected. ITA normally sends a deficiency letter in such situations in order to clarify its request. It did so here. *See* AR 79. Following Floramerica's October 10, 1988 submission (CR 23), on October 24, 1986, ITA again sent a deficiency letter specifi-

---

**13.** *See* 19 U.S.C. § 1677a(a) and (c) (1982) for definition of United States Price and Exporter's Sales Price. *See also* 19 U.S.C. § 1677(13) (1982) (defining the term "exporter" for the purpose of determining United States value).

cally noting that indirect selling expense data was missing. AR 109. On October 28, 1986, a supplemental response was submitted which merely references the numerical data in the September response. On October 31, 1986, ITA sent another letter indicating that cost data per sales unit was not supplied. Verification occurred during November and December, 1986, at which time further submissions were requested of Floramerica. On December 31, 1986, Floramerica amended its September 10, 1986 submission and provided cost figures for both the Sunburst companies and Company X. C.R. 102. Although the data sheets do not describe the components of indirect selling expenses for the various U.S. and third country sales directly, the implication of the cost sheets is that two-tier distribution expenses are involved in all relevant sales.

The third questionnaire response of Floramerica was submitted on February 5, 1987. CR 88. This was the first time that Floramerica submitted a specific textual explanation of its indirect selling expense data along with specific figures.[14] The textual explanation of the numbers, however, seemed more clear than it actually was. As to the U.S. side of the equation, Floramerica's explanation of the figures was that the "selling expense adjustment has been limited to the costs *incurred by Sunburst Farms and Sun Petals* in making sales in the United States" (emphasis added) CR 88 at 4. Floramerica also referred ITA to Attachment 17 of its December 31, 1986 submission. (This was a correction to the earlier Attachment 17 to the September 10, 1986 submission (CR 19).) The statement continues:

> A comparable figure has been calculated with respect to indirect selling expenses incurred by the Floramerica Group, including Sunburst Holland, in selling to Germany. Indirect selling expenses incurred by Sunburst Farms in selling to Canada are the same as the

costs incurred in connection with U.S. sales.

CR 88 at 4.

ITA took the specific statement with regard to the expenses listed in Attachment 17 as to U.S. sales literally. It assumed correctly that the Panamanian distributor's expenses were missing and added them to the ESP deduction. The next step is where ITA erred. It passed over the statements that the third country expense data was "comparable" or "the same," and did not add the Panamanian distribution costs to the offset to the ESP deduction. The examiner focused instead on the statements indicating that the U.S. sales figures included only expenses *incurred by* the U.S. entities, and that the third country sales figures included all the selling expenses of the *Floramerica Group*, including the European distributor. This last phrase implies that the concept "Floramerica Group" included all of Floramerica's distributors. Furthermore, one cannot merely compare the U.S. and Canadian data in CR 88 and see that the indirect selling expenses are the same as to both the U.S. and Canadian sales, that is, that certain expenses are missing from both, because German sales are aggregated with the Canadian sales. Floramerica apparently was requested to present its information in that manner.

Given that ITA had the information readily available (it used it to make deductions on the U.S. price side), and that to the extent it focused on the issue, ITA probably intended to grant the full offset, this matter comes down to placing responsibility for what is a simple error.

On one hand, ITA could have been more diligent in recognizing the inconsistency between the February 5, 1987 statements of data comparability and its own conclusion that Panamanian expenses were missing on only one side of the comparison. On the other hand, Floramerica could have avoided the confusion by clearly indicating Panamanian expenses were not included. In this

---

**14.** The similar textual explanation at page 96 of Asocolflores' pre-hearing brief is unconnected to specific figures.

regard, the parties were equal in their lack of attentiveness.[15]

The deciding factor here is that this was a last minute submission—Floramerica's last chance to explain itself after failing on numerous occasions to present its numerical data properly and to relate it to a coherent textual explanation. ITA could not be expected on February 5, 1987, to make the same inquiries it would have made on September 10, 1986, or during verification. This information was provided post-verification. At that point there is no room for lack of clarity by the only party apparently in a position to explain its own data, Floramerica.

The court realizes it is perpetuating an "error," but if these investigations are to be successful, parties must submit data promptly, and be very clear as to what the data indicates. The court also notes the numerous other errors and discrepancies which led petitioner to allege failure of verification by Floramerica. Just as the court found ITA did not abuse its discretion in finding a successful verification, the court finds ITA did not abuse its discretion in refusing to recalculate the margin when the error made by ITA is attributable to plaintiffs' late submission of ambiguous information.

### 2. Use of Third Country Prices in General

Asocolflores alleges that third country prices are unfairly used as surrogates for home market prices, in place of constructed value, for two reasons. One, it alleges that the third country product mix is composed of higher quality flowers than are sold in the United States. Two, it alleges that European sales are made on a fixed priced

basis, while U.S. sales are made on a consignment basis.

These statements are either overbroad or unsubstantiated. No citation to the record regarding the quality of the flowers sold in Europe or Canada is given. Some U.S. sales are made on a fixed price basis. No claim is made that all Canadian sales are made on a fixed price basis. Asocolflores ignores the fact that the act is designed to compensate for dumping, however it materializes, and the fact that ITA made ample adjustment for selling conditions in the United States versus those in third countries. If properly adjusted, third party sales may be utilized by ITA to make a fair comparison.

### 3. Use of Both Constructed Value and Third Country Sales for Foreign Market Value

Asocolflores also argues that ITA was required to use either constructed value or third country prices where no adequate home market sales existed, but that it could not use both methods for one producer. The court can find absolutely nothing in the statute or legislative history which forbids ITA's practice in this regard. *See generally*, 19 U.S.C. § 1677b(a).[16]

ITA is not required to eliminate third country prices as a possible surrogate for home market price before resorting to constructed value. This statutory flexibility is intended to assist ITA by lessening its administrative burdens. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 95–96 (1979), U.S. Code Cong. & Admin.News pp. 381, 481, 482. The statute, however, does not mandate use of only constructed value for a particular producer when ITA is able to use third country prices for certain periods but not for others. The statute favors use of actual prices where appropriate. *Id.*

---

**15.** This case is distinguishable from *Far East Machinery Co., Ltd. v. United States,* 12 CIT ——, 688 F.Supp. 610 (1988) in which the court ordered a remand to enable ITA to consider documentation which was submitted late in a proceeding. Unlike the *Far East* case, in this case ITA's requests were not misleading and there were no shifts by ITA in defining the standards applicable to the issue. Furthermore, in *Far*

*East* at least one party spelled out clearly exactly what the numbers of concern indicated. That did not happen here.

**16.** Any use of the disjunctive in the legislative history, that is, constructed value *or* third country prices, is unrelated to the concept of "per producer."

#### 4. Exclusion of Certain Flores Del Rio (Del Rio) Sales in Calculating Third Country Price

Asocolflores asserts that certain Del Rio sales should be omitted from the foreign market value calculation. Presumably this would result in use of constructed value because of inadequate third country sales. *See* 19 U.S.C. § 1677b(a). As indicated, actual prices are preferred if they may be used appropriately. The only reason offered for exclusion of the sales at issue is that they are alleged to be sales for export to the United States as opposed to the third country. The orders, though received from the U.S. distributor, were for direct shipment to Canada. The contractual arrangements are the same for U.S. and Canadian customers. That the reseller remits payment to Del Rio does not change the result that the merchandise was sold for export to Canada. The sales should not be excluded.

#### 5. Cost of Production, Treatment of Culls

##### a. *Allocation of Production Costs to Culls*

▇▇▇▇ As did the producers, ITA treated certain non-export quality flowers as "culls." Culls were often disposed of as waste, or if saleable, were sold for low prices in the local market. ITA's treatment of non-export quality flowers as a by-product was supported by substantial evidence. The record indicates that cull value was relatively low and that production of culls is unavoidable.[17] These both have been recognized by ITA in the past as indicia of by-product status. *See* discussion in *IPSCO, Inc. v. United States*, 12 CIT ——, 687 F.Supp. 633, 636–7 (1988). Nothing in the record indicates that other factors should have altered the outcome here. Cull value, if determinable, should be deducted from cost of production and production costs should not be allocated to culls. *Id.* ITA's methodology is sustained in this regard.

##### b. *Uniflor's Cull Credit*

Asocolflores, somewhat contradictorily, alleges the Uniflor's cull value offset to producer cost was too low because ITA only allowed the offset when it could relate cash journal entries to receipts. It is within ITA's discretion not to accept cash journal entries as sufficient verification.[18]

### D. *U.S. Price Issues*

#### 1. U.S. Price Deduction for Customer Credits

▇▇▇ 19 U.S.C. § 1677a(d) (1982) requires that United States Price be reduced for expenses incident to bringing the merchandise from the place of shipment to the place of sale in the United States, if such expenses are included in the price in the United States. Credit returns were shown to be a standard U.S. selling practice which were covered in various sales agreements. The credits were treated by the consignees as reducing gross sales value. ITA states that, therefore, it complied with the statute by reducing U.S. price to reflect credit returns. (ITA does not say which producers are affected by this).[19] ITA does indicate that for one respondent, La Pampa, it reduced U.S. price to account for such credits but that it did *not* reduce the number of units sold, for U.S. price purposes, because necessary unit data was missing. *See* 52 Fed.Reg. at 6850 (comment 21). This indicates that ITC likely would have reduced total units sold by the number of units of returned unsalable merchandise if it had

---

**17.** Plaintiffs do not support their statement that some "second quality" flowers were of a value approaching that of export quality flowers. As far as the court understands ITA's methodology, costs are allocated over all "export quality" flowers; this does not include seconds, splits or culls. ITA maintained consistency by excluding, where possible, any such sales on the U.S. price side of the comparison.

**18.** Asocolflores indicates at p. 77 of its brief that the cull offsets which were allowed were allocated improperly. Defendants did not address this. This item should be explained or corrected on remand.

**19.** Plaintiffs do not adequately support their general argument that no reduction for credit returns should be made at all. *See* 52 Fed.Reg. at 6850 (comment 9).

such data. It does not appear that La Pampa provided such data. *Id.*

In the case of consignment sales, the effects of sales of flowers which deteriorate after shipment but remain saleable have already been accounted for, at least partially, through ITA's U.S. price averaging techniques. Furthermore, certain U.S. sales of deteriorated merchandise were excluded from the U.S. price calculation. *See* 52 Fed.Reg. at 6852 (comment 40). Any actual returns, i.e., non-sales, should have been documented in order for the number of units to be reduced along with the credit return deduction. Plaintiffs have not demonstrated error by ITA in this regard.

### 2. Non-payment by Uniflor's Customers

Asocolflores argues that sales that were made with the expectation of prompt payment but for which payment was never received because of the customer's bankruptcy should be excluded in calculating U.S. price. ITA treated the sales at issue as sales at invoice value minus a credit expense at a very high interest rate for a period of more than one year.

Defendant did not respond to Asocolflores' argument. Nor is ITA's final determination illuminating on this point. There is no evidence that these sales in any way reflect Uniflor's normal credit practices. Furthermore, ITA's past methodology in this regard is superficially inconsistent. *Compare Neoprene Laminate from Japan*, 52 Fed.Reg. 36,295 (1987) (final antidumping determination finding non-payment sale includable at contract price after adjustment for imputed credit expense) *with Neoprene Laminate from Taiwan*, 52 Fed.Reg. 37,193, 37,194 (1987) (final antidumping determination finding such sales excludable as unrepresentative).

FTC made several arguments, including an analogy to the integrity of the sample.[20] It is one thing to include producers in a sample; whether they are typical or atypical is difficult to judge. Once the producer is included, however, all of its sales need

not be included in order to maintain sample integrity. ITA must make a determination as to which sales of the included producer are so unrepresentative as to be unfairly distorting. *See Sonco Steel Tube Div. v. United States*, 12 CIT ——, 694 F.Supp. 959, 962 (1988). ITA made many similar choices throughout this investigation. It must make this one as well, and explain it.

### E. *Uniflor's Rate as Best Information Otherwise Available*

Plaintiffs allege that Uniflor's rate should not have been utilized as best information available for the non-responding companies because its experience as a small exporter is atypical. Plaintiffs have not demonstrated that Uniflor's experience is atypical of the class of all producers and exporters in any relevant way. ITA's standard practice is to use the highest rate available as best information available in the face of substantial non-compliance. "Best information available" is not necessarily accurate information, it is information which becomes usable because a respondent has failed to provide accurate information. *See Pistachio Group v. United States*, 11 CIT ——, 671 F.Supp. 31 (1987). Uniflor's rate was an acceptable rate to use for "best information otherwise available" purposes. 19 U.S.C. § 1677e(b) (1982).

### Conclusion

ITA's overall approach to this investigation is found to be within the bounds circumscribed by the statutory scheme. This matter must be remanded, however, for correction of certain clerical errors noted by the parties. In addition, the court requires further explanation and/or reconsideration of ITA's conclusion as to Flores Esmeralda's interest credit (*supra* at 1119); material costs for Timana, La Pampa and Uniflor (*supra* at 1118–19); cull value offsets for Timana, La Pampa (*supra* at 1117–18) and Uniflor (*supra* at 1125 n. 18); and the treatment of Uniflor's U.S. sales for which payment was not received (*supra* at

---

**20.** FTC's other arguments on this issue are overstated. Specifically, a zero U.S. sales price

would not be appropriate.

1126). ITA is to submit its remand determination within 30 days. Any party wishing to comment thereon shall do so within 10 days thereof. Responses shall be filed 5 days thereafter.