**WHEATLAND TUBE CORPORATION,**
Plaintiff,

v.

**The UNITED STATES OF AMERICA, Defendant,**

and

**Saha Thai Steel Pipe Co., Ltd,**
**Defendant–Intervenor.**

Court No. 91–11–00795.
Slip Op. 93–220.

United States Court of
International Trade.

Nov. 29, 1993.

serious questions of petitioner's candor, veracity, and ethical conduct.

Schagrin Associates, Roger B. Schagrin, Mark C. Del Bianco, Washington DC, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, U.S. Dept. of Justice, Civil Div., Commercial Litigation Branch, Michael Kane and Vanessa P. Sciarra, Wendell L. Willkie, Gen. Counsel, U.S. Dept. of Commerce; of counsel: Jeffrey B. Denning, U.S. Dept. of Commerce, Office of Chief Counsel for Import Admin., for defendant.

Dickstein, Shapiro & Morin, Arthur J. Lafave, III, Douglas N. Jacobson, Frances Scibelli, Washington DC, for defendant-intervenor.

## MEMORANDUM OPINION

MUSGRAVE, Judge.

Plaintiff Wheatland Tube Corporation ("Wheatland Tube") challenges the final determination by the International Trade Administration, United States Department of Commerce (the "ITA" or the "Department" or "Commerce"), in *Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand, Final Results of Countervailing Duty Administrative Review* 56 Fed.Reg. 50,852 (Oct. 9, 1991). In essence, Wheatland Tube asserts that Commerce violated its statutory mandate to determine the tax incidence and excessive remission of rebates by a country for the purpose of assessing countervailing duties by accepting figures from the Thai government on a *sector-wide* basis rather than for the specific *product* at issue in the review—circular welded carbon steel pipe and tube.[1] As a result, plaintiff contends,

---

1. The subject merchandise is described as "circular welded carbon steel pipes and tubes ... with an outside diameter of 0.375 inch or more but not over 16 inches, of any wall thickness.

Commerce undervalued the actual benefit to the Thai producers, artificially lowered the countervailing duties, and adversely affected the U.S. industry.

## Background [2]

The final review at issue is the second administrative review of the pipe and tube order in which Commerce found that producers or exporters of circular welded carbon steel pipe and tube were receiving countervailable benefits from two countervailable programs administered by the Government of Thailand ("GOT"), one of which was the Tax Certificates for Exports Program (Tax Certificate Program). *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 50 Fed.Reg. 32,751 (August 14, 1985).

The Tax Certificate Program was investigated and verified in the original investigation which resulted in the Thai pipe and tube order, and has been reviewed in the two successive administrative reviews of that order. The Program was authorized by the Tax and Duty Compensation of Exported Goods Produced in the Kingdom Act of 1981. Pursuant to the Program, the Thai government issues tax certificates to exporters to rebate indirect taxes and import duties on the inputs consumed in the production of exports. The tax certificates rebate indirect taxes and duties on both physically incorporated inputs, and non-physically incorporated inputs (*e.g.,* fuel, office equipment and services). Remission of indirect taxes and duties on the non-physically incorporated inputs is countervailable pursuant to 19 U.S.C. § 1303. The determination of the countervailable benefit is made by comparing the rebate rate determined pursuant to the Tax Certificate Program with the allowable rebate calculated

by Commerce. *See Carbon Steel Butt–Weld Pipe Fittings,* 55 Fed.Reg. 1695 (Jan. 18, 1990). If the allowable rate is less than the rebate rate determined pursuant to the Tax Certificate Program, the difference is a countervailable subsidy in the form of an excessive rebate of indirect taxes.

The Thai Ministry of Finance (MOF) computes the rebate rates to be used in the Tax Certificate Program upon the basis of an Input/Output (I/O) study. The I/O table developed in the study was constructed by the National Economic and Social Development Board ("NESDB") of Thailand, in cooperation with the Japanese Institute of Developing Economies and the National Statistical Office of Thailand. The initial study was published in 1980 using 1975 data and was updated in 1985 using 1980 data. *See* 56 Fed.Reg. 29,222 and accompanying explanation in *Defendant's Brief at 5.*

The I/O table provides statistical data on the input structure and output distribution of each product and service manufactured, grown, or produced in Thailand. As such, asserts defendant-intervenor, "it represents a comprehensive model of the Thai economy as a whole." *See Defendant–Intervenor's Brief at 5.* The MOF uses the I/O study to compute the value of total inputs (including both domestic and imported inputs) used in a range of sector-specific products, at ex-factory prices. Among 134 agricultural and industrial products identified in the study, pipe and tube products are found in section 106. *See P.R. 14 at 14–15.*[3]

The input structure lists each input consumed by a particular sector, together with data concerning the total value of the input at purchaser's price, trade margin, transportation costs, total value of the input provided by imports, the total value of the input provided by domestic producers and the input

---

These products, commonly referred to in the industry as standard pipe or structural tubing, are produced to various ASTM specifications, most notably A–120, A–53 and A–135. *See Circular Welded Carbon Steel Pipes and Tubes from Thailand, Final Results of Countervailing Duty Administrative Review,* 56 Fed.Reg. 50,852 (October 9, 1991).

**2.** The Court quotes without attribution the uncontroverted facts in the record. Citations to documents contained in the public record of this

administrative review are designated "P.R." Citations to documents contained in the confidential record of this administrative review are designated "C.R."

**3.** Other finished products in sector 106 include butt-weld pipe fittings, malleable cast iron pipe fittings, galvanized sheet, plate, hot-rolled sheet, semi-finished steel plate and sheet, bards and rods, and other secondary steel products. *P.R. 14 at 14–15* and *Exhibit 8, P.R. 14 at 2–4.*

coefficient (total value of the input consumed by the sector divided by the total value of output of the sector).

The output structure sets forth the distribution (*i.e.,* sales) of the output of a particular product or service among the various sectors of the Thai economy and to foreign purchasers.[4] The output structure shows the total value of output of the product at purchaser's price, trade margin, transportation cost, total value of output at producer's price, output value from imports, and output value from domestic producers.

The I/O table for 1975 was constructed by selecting a survey group in each of the 134 sectors of the Thai economy. The survey groups were sent questionnaires requesting information regarding the total input and output mix of their production during calendar year 1975. Based on the survey results, average input and output coefficients were computed for each input into a particular product and the distribution of output. The resulting coefficients were multiplied by a "control total" to yield the total absolute values (in Thai baht) for each input and output on an economy-wide basis. The "control total" is equal to the total value of output of the product or service as derived from national statistical sources in Thailand. *See Defendant–Intervenor's Brief at 6.*

The MOF table did not establish separate rates for each distinct product. Rather, the MOF calculated the import duties and indirect taxes on each input, and then calculated two "rebate rates." The "A" rate determines the available rebate for import duties and indirect domestic business taxes. To compute the "A" rate, the MOF sums the incidence of indirect taxes on all inputs into the finished product sector (in this case "Secondary Steel Products"), including customs duties, import sales taxes, and domestic sales taxes, and then divides by the "control total" (*i.e.,* by the value of total output of the sector).

The "B" rate determines the available rebate for indirect domestic business taxes. The "B" rate is claimed by exporters who participate in Thailand's "customs duty drawback program" or "import duty exemptions on raw materials program," or who do not use imported raw materials in their production process. In computing the "B" rate, Customs duties and import sales taxes are excluded from the calculation. The difference between the A and B rates is supposed to be the equivalent of the import taxes from which the imports have been exempted, or the duty drawback which the importer received. The appropriate rate is then applied to the f.o.b. value of the export to determine the amount of rebate to be provided to the exporter. *See* 56 Fed.Reg. at 29,222–23; *P.R. 17.*

In calculating the rebate rates for pipe and tube products, the MOF divides the incidence of indirect tax for *all* physically incorporated and non-physically incorporated inputs consumed in the production of all products included within a sector by the value of *total* domestic production of finished goods included in that sector. *Id.* The resulting rebate rates represent the weighted-average incidence of indirect tax for each product sector, expressed in percentage terms.

As noted above, the GOT based its calculations for each sector on the responses of domestic producers of products in that sector to its study questionnaire. The GOT received no questionnaire responses from the pipe and tube subsector in the course of its sector 106 study. *See Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 56 Fed.Reg. 25,407, 25,408 (June 4, 1991) (Comment 2) (the final determination of the most recent (1987) review of this order). Instead, it relied on unidentified company profit and loss accounts and case studies. *Id.*

The sectoral rebate rates were based on duties and taxes imposed on many different inputs, not all of which were used in manufacturing each product in the sector. Duties and taxes on 31 inputs were used by the GOT to calculate the tax incidence (and thus the

---

4. Defendant–Intervenor sets forth as an example leather products (i/o 076), which are distributed, *inter alia,* to private consumption (i/o 301), exports (i/o 305), wholesale trade (i/o 145), hotels (i/o 146) and footwear (i/o 177).

rebate rates) for sector 106.[5] Only six of these inputs are used in standard pipe production. The inputs and their I/O sectors are: hot-rolled sheet (106), zinc (107), zinc chloride and other additives to the zinc bath (087), steel straps (106), plastic sheet (098), and painted labels (087).[6]

The I/O table establishes that there are two categories of steel products incorporated as inputs in sector 106 products. The first category is basic iron and steel products, which are included in sector 105. The parties do not dispute that no sector 105 inputs are used in the manufacture of the subject standard pipe in Thailand.[7]

The second category of steel products incorporated in sector 106 products is other secondary steel products, such as hot-rolled steel sheet, which also fall in sector 106. *Plaintiff's Brief at 6; see P.R. 14, Exhibit 8.* The only hot iron or steel input for the pipe and tube under review is hot-rolled sheet. It is undisputed that all hot-rolled sheet, also referred to as hot-rolled coil, used in Thailand during the period of review was imported.[8]

Commerce has previously verified the validity of the I/O tables and the methodology used by the MOF to calculate the rebates based upon this data. *See e.g., Steel Wire Rope from Thailand,* 56 Fed.Reg. 46,299 (Sept. 11, 1991); *Carbon Steel Butt–Weld Pipe Fittings from Thailand,* 55 Fed.Reg. 1695 (Jan. 18, 1990) (*"Butt–Weld Pipe Fittings"*).[9] The rebate rates available under the Tax Certificate Program during the period of the second administrative review were calculated by the Thai government based upon the updated I/O study published in 1985. The "A" rate for secondary steel products (sector 106), which includes circular welded pipe and tube, was 8.11%. The "B" rate for sector 106 was 4.98%. *See* 56 Fed. Reg. 29,222–23; *P.R. 17.* Wheatland does not contest the amount rebated as import duties and import taxes on imported inputs (*i.e.,* the differential between the "A" and "B" rates).

Commerce determines the amount of "bounty or grant" by deducting the "allowable" rebate from the actual rebate rate. To determine the allowable rebate rates, *i.e.,* the amount of the rebate which reflects indirect taxes on inputs that are physically incorporated in the finished product, Commerce divides the import duties and tax incidence on all items physically incorporated into all I/O sector 106 products by the adjusted value of all domestically produced finished goods in that sector. Commerce then compares the authorized rebate rate as determined by the MOF (which was based on both physically incorporated and non-physically incorporated inputs) to Commerce's calculated, allowable rebate rate (which was based on only physically incorporated inputs).

The allowable "A" rate was computed by dividing the total taxes on inputs which Commerce determined to be physically incorporated in sector 106 products by the total inputs (FOB) for sector 106 products, yielding a rate of 7.30%. The allowable rate was subtracted from the nominal rate of 8.11% to yield an "excess" rebate, or "bounty or grant," of .81% ad valorem. *See Defendant–Intervenor's Brief, Attachment I at 6; C.R. 4.*

The allowable "B" rate rebate was calculated by dividing the total domestic taxes on

---

**5.** The inputs included in the GOT tax calculation are identified in Exhibit 8 to the Questionnaire Response, *P.R. 14.*

**6.** *Id.*

**7.** Plaintiff argues that Commerce should have modified the I/O table calculation to deduct the amount of domestic taxes for sector 105 inputs, none of which were physically incorporated into Thai standard pipe. *See infra,* discussion of table modifications.

**8.** Hot-rolled coil is the only significant physically incorporated input in ungalvanized pipe and tube. Imported coil incurs no domestic business tax—it only incurs import duties and taxes which are rebated under the duty drawback program or the "A" rate. Since Commerce assessed the pipe and tube at the "B" rate, which allows credit for domestic business taxes, Wheatland tube argues that Saha Thai received an unearned credit for domestic taxes paid by producers of other sector 106 products on sector 105 inputs used to produce those other products. *Plaintiff's Brief at 5–6; see infra,* discussion of table modifications.

**9.** Other citations were omitted. *See Defendant–Intervenor's Brief at 7.*

physically incorporated inputs by the total inputs (FOB value), yielding a rate of 4.47%. This was subtracted from the nominal "B" rebate rate to yield an excess rebate of .51%; *see* 56 Fed.Reg. 29,223.

Five of the six Thai producers subject to the 1988 Review did not cooperate with Commerce's investigation. Commerce, relying on "best information available," assumed that all of their tax certificates were received at the "A" rate and assigned them a bounty or grant of .81%. Defendant–Intervenor, Saha Thai, the cooperating producer, received rebates at only the "B" rate, and was assigned a "bounty or grant" of .51%.

### Standard of Review

■ Commerce's final determinations in countervailing duty administrative reviews must be sustained unless they are unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). It is well established that the agency has broad discretion to apply reasonable methodology and procedures to calculate the net benefits of bounties or grants under the countervailing duty laws. *See e.g., United States v. Zenith,* 562 F.2d 1209 (CCPA 1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987); *Budd. Co. v. United States,* 15 CIT 446, 450, 773 F.Supp. 1549, 1553 (1991). In reviewing an agency's interpretation of a statute, "[i]f the statutory language is clear, 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Creswell Trading Co. v. United States,* 783 F.Supp. 1418, 1420 (CIT 1992) (*citing Chaparral Steel Co. v. United States,* 8 Fed.Cir.(T) 101, 105, 901 F.2d 1097, 1101 (1990) and *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct.

2778, 2781–82, 81 L.Ed.2d 694). "When the statute is not clear, and the agency has made an interpretation, the court must examine the agency's interpretation as to whether it is 'based on a permissible construction of the statute.'" *Id., citing id.*

■ The ITA's exercise of administrative discretion will not be sustained, however, if it contravenes statutory objectives. *See Ipsco, Inc. v. U.S.,* 8 Fed.Cir.(T) 80, 83, 899 F.2d 1192, 1195 (Fed.Cir.1990).[10] The Court must be ever vigilant of abuse of discretion by the agency, given the agencies' strength and expertise. *See id.* (citations omitted). This Court has noted that it "will not allow [the] agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute." *Ceramica Regiomontana,* 10 CIT at 405, 636 F.Supp. at 966.

### Discussion

#### 1. Issue Preclusion

■ As a preliminary matter, Saha Thai argues that Wheatland is precluded by the doctrine of collateral estoppel (or "issue preclusion") from making its arguments before this Court because Wheatland previously challenged the sector-wide approach used by Commerce to calculate the allowable rebate rates at the administrative level in the 1987 review and the 1988 review. Issue preclusion may be described as follows:

> When an issue of fact or law is actually litigated and determined by a valid and *final judgment,* and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim (emphasis supplied by the Court).

*Restatement (Second) of Judgments,* at § 27 (introductory note); *see also United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984); *PPG Industries,*

---

**10.** *See also, Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986) ("[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress"); *accord, Creswell Trading Co. v. United* *States,* 783 F.Supp. 1418 (CIT 1992); *S.E.C. v. Sloan,* 436 U.S. 103, 118–19, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978) (courts must reject an agency's statutory interpretations that are "inconsistent with the statutory mandate or that frustrate the policy underlying a statute").

*Inc. v. U.S.,* 14 CIT 522, 538, 746 F.Supp. 119, 133 (1990) ("PPG IV").

Saha Thai contends that collateral estoppel (issue preclusion) may apply to administrative determinations as well as judicial ones. *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). The *Utah* court held that "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *Id.* at 422. Therefore, the Court must determine whether the proceedings of the ITA are sufficiently adjudicatory under *Utah* to merit the application of *res judicata* principles. *See id.; University of Tennessee v. Elliot,* 478 U.S. 788, 798 & n. 6, 106 S.Ct. 3220, 3226 & n. 6, 92 L.Ed.2d 635 (1985); *Restatement (Second) of Judgments* § 83(1)–(2) (1982).

Saha Thai writes that there is an acute need for consistency and predictability in the administration of the "unfair trade" laws. *Defendant–Intervenor's Reply Brief at 6.* Saha Thai contends that "repeated challenges to settled administrative decisions in countervailing duty proceedings encourage abuse of the process and waste the parties' and the agency's resources by requiring a response that will withstand judicial scrutiny each time they are raised." *Id.*

The Court recognizes the value and need for consistency and predictability in the administration of the trade laws.[11] There are, however, compelling reasons specific to judicial review of trade law for closely scrutinizing assertions of collateral estoppel:

> The burden on the party seeking issue preclusion is and should be exacting. This is especially so in trade cases, since Congress has made specific provision for periodic administrative reviews in countervailing duty and dumping cases. . . . Since the agencies involved perform the function of expert finders of fact concerning different programs, different time frames, economic statistics and other factors in countervailing duty and dumping investigations as well as similar functions during periodic reviews, principles of issue preclusion should be carefully applied. To hold otherwise would have a chilling effect upon the administrative processes envisioned by the Congress.

*PPG Industries, Inc. v. United States,* 14 CIT 522, 538–39, 746 F.Supp. 119, 133 (1990) (PPG IV), *citing PPG Industries, Inc. v. United States,* 13 CIT 297, 302, 712 F.Supp. 195, 199 (PPG III).

Note that in *PPG IV,* there had been previous involvement of the Court of International Trade in prior reviews. The Court in *PPG IV* was addressing claims of issue preclusion regarding past *Court* determinations involving reviews of PPG (*i.e., PPG I–III*).[12] The issue of whether the Court should be bound by previous holdings of the underlying administrative agencies that were never reviewed by the Court ·was not before the Court; yet even in that instance the Court carefully weighed whether to accept issue preclusion. Even closer scrutiny is required under the latter circumstances now before the Court for decision.

Wheatland points out that among the essential elements of an adjudicatory proceeding are the presentation of evidence and legal argument, the fair opportunity to rebut evidence and argument, and "[s]uch other procedural elements as may be necessary . . ., having regard for . . . the opportunity of the parties to obtain evidence and formulate legal contentions." *Restatement (Second) of Judgments* § 83(1) (1982); Kenneth Culp Davis, 4 *Administrative Law Treatise* 51–52 (1983) ("*res judicata* applies when what the

---

**11.** For a detailed development of this thesis, see David A. Hartquist, Jeffrey S. Beckington and Kathleen W. Cannon, *Toward a fuller appreciation of nonacquiescence, collateral estoppel, and stare decisis in the U.S. Court of International Trade,* 14 Fordham International Law Journal 112–138 (1990) and Charles H. Nalls and Paul R. Bardos, *State Decisis and the U.S. Court of International Trade: two case studies of a perennial*

issue, 14 Fordham International Law Journal 139–185 (1990).

**12.** The *PPG IV* Court ultimately found that there was not a sufficient showing of identity of issues with *PPG II* to apply collateral estoppel in the latter case. *PPG IV,* 14 CIT at 539, 746 F.Supp. at 134.

agency does resembles what a trial court does").

Wheatland contends that countervailing duty determinations fail to satisfy the criteria of *Utah Construction* and the Restatement for administrative estoppel:

> Commerce does not act in a judicial capacity during these proceedings, and the parties do not have "adequate opportunity to litigate" there because the procedural safeguards of a trial are lacking. There is no administrative law judge conducting the proceeding, no cross-examination, no ability to call opposing witnesses, and no compulsory process. Even the cases Saha Thai relies upon recognize that certain minimal procedures are required for administrative estoppel to apply.[13]

In fact, as Wheatland correctly points out, this Court has held that "[a]ntidumping proceedings are investigatory, not adjudicatory." *Timken Co. v. United States,* 10 CIT 86, 92, 630 F.Supp. 1327, 1333 (1986), *citing* H.R.Rep. No. 317 at 77 and *Sacilor, Acieries et Laminoirs de Lorraine v. United States,* 3 CIT 191, 195, 542 F.Supp. 1020, 1025 (1982).

On a practical level, if the Court grants preclusive effect to prior administrative rulings that were never before reviewed by the Court of International Trade, the administrative agencies may well be transformed into courts of first instance. Litigants, fearful of the preclusive effect of the agencies' findings in each annual review, would be forced to litigate thoroughly every issue in every review regardless of the economic sense of such litigation. Appeal to the Court of International Trade would be sought as a matter of course on every issue, no matter what the stakes, or the parties would be cut off from judicial review of the administrative decision.

On a theoretical level, the implications are equally troubling. The balance of power between the executive and the judiciary is firmly rooted in the Constitution. Federal agency expertise in administering statutes, especially the trade laws, "cannot and should not replace agency accountability before the courts, and through the courts, to the parties affected by agency determinations."[14] As discussed above, parties would be cut off from the courts unless they litigate fully every issue in every review up through the appellate process.

Moreover, in addition to the particularities of the trade laws discussed above, foreign parties—and indirectly their national governments—appear before the agencies and this Court frequently. The availability of review of executive agency determinations by a separate and independent judiciary contributes to the credibility of the trade laws in the international arena and perceptions of the fairness of enforcement of those same laws.

Finally, the Court notes with great interest that the Department of Commerce has not joined in this aspect of Saha Thai's motion for judgment on the agency record. Indeed, the Supreme Court has frowned upon the offensive use of collateral estoppel against the government by nonparties. *See U.S. v. Mendoza,* 464 U.S. 154, 159–61, 104 S.Ct. 568, 571–73, 78 L.Ed.2d 379 (1984).[15] The Court concluded therein that the avoidance of collateral estoppel "will better allow thorough development of legal doctrine by allowing litigation in multiple forums. Indeed, a contrary result might disserve the economy interest in whose name estoppel is advanced by requiring the government to abandon virtually any exercise of discretion in seeking to review judgments unfavorable to it." 464 U.S. at 163, 104 S.Ct. at 574; *see* Jack H. Friedenthal, Mary Kay Kane and Arthur R. Miller, *Civil Procedure* § 14.12 (1985). Additionally, the Supreme Court has held from time to time that administrative agencies must be given the flexibility to review and alter its policies and interpretations on a continuing basis. *See Chevron,* 467 U.S. at

---

13. *See Sierra Club v. Block,* 576 F.Supp. 959 (D.Or.1983); *Zaika v. Del E. Webb Corp.,* 508 F.Supp. 1005 (D.Nev.1981); *Bowen v. United States,* 570 F.2d 1311, *reh'g denied* 570 F.2d 1311 (7th Cir.1978); *Ness Inv. Corp. v. United States,* 595 F.2d 585, 219 Ct.Cl. 440 (1979); *Painter's Dist. Council No. 38 v. Edgewood Contracting,* 416 F.2d 1081 (5th Cir.1969).

14. *See* Hartquist, *supra,* at 122.

15. The policy arguments formulated by the Supreme Court in *Mendoza* are relevant to this case even though the *offensive* use of collateral estoppel is not before the Court.

862, 104 S.Ct. at 2791; *Rust v. Sullivan*, 500 U.S. 173, ——, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991) (and cases cited therein).

■ Similarly, as the *PPG III* Court noted above, the framework of the antidumping laws and the factual nature of the related annual investigations are disserved by the application of collateral estoppel in most instances even with prior Court involvement. After considering the parties arguments, the purpose and structure of the antidumping laws, and guiding precedent, this Court holds that collateral estoppel is not applicable to administrative determinations, under the antidumping laws, that have never been reviewed by the Court of International Trade.

Nonetheless, successive prior administrative decisions may be persuasive to the extent that those determinations indicate a long standing and well developed policy choice on behalf of the agency. Presumably, the more frequent the application of a certain policy, the more susceptible it is to statistical verification for accuracy. The accuracy of results, in turn, indicates the reasonableness of the policy. As the *Rust* Court pointed out, however, the agency must be permitted to alter its policies to accommodate reasonable new approaches that are in accordance with the statutes. The Court now turns to the merits of Wheatland's claims.

### 2. *"Like Product" Comparison*

Wheatland Tube argues that Commerce should not be permitted to use the I/O tables or, in the alternative, that Commerce should be ordered to modify the I/O table with regard to sector 106 to take account more precisely for the relationship between the tax incidence and the Tax Certificate rebate for the specific product at issue—circular welded carbon steel pipe and tube. According to Wheatland Tube, both the GATT and U.S. law require Commerce to determine whether a subsidy exists by comparing the indirect taxes rebated on the "like product" to the

actual indirect taxes paid on inputs physically incorporated in that like product.

Paragraph (h) of the Illustrative List of Export Subsidies annexed to the GATT Subsidies Code defines as one form of subsidy:

The exemption, remission or deferral of prior stage cumulative indirect taxes on goods or services used in the production of exported products in excess of the exemption, remission or deferral of like prior stage cumulative indirect taxes on goods or services used in the production of *like products* when sold for domestic consumption; provided, however, that prior stage cumulative indirect taxes may be exempted, remitted or deferred on exported products even when not exempted, remitted or deferred on *like products* when sold for domestic consumption, if the prior stage cumulative indirect taxes are levied on goods that are physically incorporated (making normal allowance for waste) in the exported product. [emphasis supplied by plaintiff].[16]

As plaintiff points out, U.S. countervailing duty law specifically incorporates this GATT definition.[17] The statute defines "like product" as the "product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation...." 19 U.S.C. § 1677(10). Plaintiff asserts that the like product here is carbon steel standard pipe and tube under 16 inches in diameter. Commerce does not deny the applicability of the above-cited law or that the like product is carbon steel pipe and tube under 16 inches in diameter. In essence, plaintiff claims that Commerce improperly substituted "like sector" for "like product" in performing the calculations mandated by the statute and the GATT.

In contrast, the issue as defendant frames it before the Court is whether and to what degree the Court may impose upon Commerce the obligation to obtain information demanded by statute that is either not available or very difficult to obtain.[18] Commerce

---

**16.** Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade (1979).

**17.** Section 771(5)(A) of the Tariff Act of 1930 (the "Act"), as amended, 19 U.S.C. § 1677(5)(A).

**18.** The irony of this situation is not lost on the Court. Commerce's normal course of action where the foreign country or company does not supply accurate or sufficient information, in a form that Commerce can easily apply to the

appears to concede that the statute requires it to establish a link between the subsidy and the product. Otherwise, Commerce would not accurately be able to assess whether rebates were excessive, *i.e.*, countervailable. Rather, Commerce argues that the statute is not "clear" on exactly what level of disaggregation is required in determining the link between the subsidy and the product. Therefore, under *Chevron*, Commerce claims it exercised permissible discretion in giving effect to the statute's mandate by using data concerning a particular sector rather than for the like product—carbon steel pipe and tube.

Plaintiff urges that the GATT and the statute require Commerce to make a product specific determination. To support this argument, plaintiff cites a Federal Circuit case and a prior ITA decision. The Court of Appeals for the Federal Circuit approved Commerce's methodology where that methodology required only that the foreign government had "reasonably calculated and documented the actual indirect tax incidence borne by [the exported products] and ha[d] demonstrated a clear link between such tax incidence and the amount of [the rebate] payments." *Industrial Fasteners Group v. U.S.*, 1 Fed.Cir.(T) 81, 85, 710 F.2d 1576 (Fed.Cir.1983). The court upheld the ITA's decision not to deduct certain government payments from the countervailing duty calculation in part because the ITA found that the link ·between indirect tax incidence and the payments had not been satisfactorily demonstrated. *Id.*

Upon examination of the legislative history of the statute, the court noted that "Congress wanted such export payments to be free of subsidy treatment only "if those payments are reasonably calculated, are specifically provided as non-excessive rebates of indirect taxes ... and are directly related to the merchandise exported." *S.Rep. No. 249, 96th Cong., 1st Sess. 85, reprinted in 1979 U.S.Code Cong. & Ad.News 381, 471.* The court found that the ITA regulations pertinent at the time were in consonance with the legislative history. *See Industrial Fasteners*

*Group,* 1 Fed.Cir.(T) at 86, 710 F.2d at 1580. Guideline 2 in Annex 1 to the regulations provided:

> Export payments as an estimate of indirect taxes paid: Generally the payment to an exporter of a lump sum calculated and identified as a non-excessive rebate of the indirect tax incidence on the exported product, and its components, will not be treated as a subsidy if the government has reasonably calculated and documented the actual tax experience of the product under investigation.

*Id., citing* 45 Fed.Reg. 4949. The court further stated that "the intent was that the foreign government show that the calculation of the amount of export payments was reasonable when made, through proof demonstrating the actual basis of those payments in the indirect tax incidence carried by the exported articles." *Industrial Fasteners Group,* 1 Fed.Cir.(T) at 87, 710 F.2d at 1581.

Plaintiff asserts that Commerce has consistently followed this policy of requiring that the foreign government have reasonably calculated and documented the actual tax incidence borne by the product concerned; even as recently as 1989. *See Antifriction Bearings From Thailand,* 54 Fed.Reg. 19,130 (May 3, 1989); *Certain Textile Mill Products from Thailand,* 52 Fed.Reg. 7636 (March 12, 1987); *Cotton Sheeting and Sateen from Peru,* 48 Fed.Reg. 4588 (Feb. 1, 1983). In the *Antifriction Bearings* case, Commerce compared "the rebate received to the average incidence of indirect taxes on inputs physically incorporated in bearings only." 54 Fed.Reg. at 19,137. Plaintiff concludes,

> In *Antifriction Bearings,* as in the instant case, the inputs itemized in the GOT's calculations included both inputs physically incorporated in the product under investigation and inputs not incorporated in the product under investigation. [*Id.*] In that case, Commerce properly segregated the amount of the rebate attributable to taxes and duties paid on items physically incorporated in bearings, and determined that the amount by which the authorized rebate

---

statute, is to reject the information, refuse the related deductions, and use best information to calculate a rate which is typically higher than the

one that would have resulted from the rejected information.

exceeded this figure constituted a countervailable subsidy. [*Id.*]

*Plaintiff's Brief,* at 9–10.

The Court finds that the prior determination in *Antifriction Bearings* is persuasive evidence that Commerce considered the methodology described therein a reasonable and appropriate interpretation of the statutory mandate codifying the GATT. The Court will, however, uphold Commerce's current methodology if it is also a reasonable interpretation of the statute and otherwise in accordance with law.

Commerce agrees that in the case of a government program which rebates indirect taxes and import duties, the "entire benefit is countervailable unless Commerce determines that some portion of the benefit is directly linkable to indirect taxes and import duties on inputs physically incorporated into the subject merchandise." *See Defendant's Brief, at 10.* Commerce now offers proposed regulations for this "linkage test" and proceeds to discuss how it has applied this test with satisfaction to the Thai Tax Certificate program. The *Proposed Regulations* at section 355.44(i)(4)(ii) (54 Fed.Reg. at 23,382) state

> (ii) Notwithstanding paragraph (d)(4)(i) [*sic* ],[19] in the case of a program purporting to rebate prior stage cumulative indirect taxes and/or import charges, or in the case of a program providing for a fixed rate of duty drawback shall confer a countervailable benefit, unless the Secretary determines that:
>
> (A) The program operates for the purpose of rebating prior stage cumulative indirect taxes and/or import charges;
>
> (B) The government accurately ascertained the level of the rebate or fixed duty drawback; and
>
> (C) The government reexamines its schedules periodically.

The Court notes some conspicuous differences between these proposed regulations and the regulations scrutinized in the only Federal Circuit case cited for guidance on

this issue. *See Industrial Fasteners,* at 85, 710 F.2d at 1579. At that time, the ITA "linkage test" to determine whether the export payments were subsides or non-excessive rebates of indirect taxes paid but not otherwise rebated was worded thus:

> (1) Whether the CCS program operates for the purpose of rebating indirect taxes, (2) whether there is a clear link between eligibility for CCS payments and payment of indirect taxes, and (3) whether the government has reasonably calculated and documented the actual indirect tax incidence borne by exported fasteners and has demonstrated a clear link between such tax incidence and the amount of CCS payments.

*Id.* All of the language directing that the link be between the tax program and specific products in the previous linkage test has been excised from the new test Commerce now urges on the Court.

The Department maintains that while its *Proposed Regulations* direct Commerce to determine the prior stage indirect tax incidence with respect to physically incorporated inputs into the "exported product," they do not provide a methodology to be used in making this determination. *Defendant's Brief, at 14.* Consequently, Commerce argues, "... the regulations do not prohibit Commerce from determining tax incidence based upon data that relate to a sector of products which includes the 'exported product'." *Id.* While this is certainly true, the real issue is whether the statute, not the proposed regulations, prevents Commerce from proceeding in this way.

In addition, Commerce argues that although *Industrial Fasteners* did not consider the use of product sectors for determining the weighted-average tax incidence on like products, the court's language strongly supported Commerce's position in this case. Specifically, Commerce points to language quoted above to the effect that Congress intended that "the foreign government show that the calculation was reasonable when made, through proof demonstrating the actu-

---

**19.** Commerce states that this reference is a typographical error. The correct citation is to paragraph (i)(4)(i).

al basis of those payments in the indirect tax incidence carried by the exported articles." *Industrial Fasteners,* 1 Fed.Cir.(T) at 87, 710 F.2d at 1581; *see supra,* at 1231; *accord, Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (the Court must ensure that the ITA's methodology is a reasonable means of assessing the net benefit received as a result of the illegal subsidy or grant).

Commerce places undue weight for this proposition in the guidance provided by *Industrial Fasteners* on this issue. Commerce's previous linkage test speaks of documenting the actual indirect tax incidence borne by "exported fasteners" and the link between them and the payments. Likewise, Guideline 2 in Annex I to the regulations scrutinized in *Industrial Fasteners,* considered the "exported product [ ] and its components" and whether "the government has reasonably calculated and documented the actual tax experience of the product under investigation." *Industrial Fasteners,* at 86, 710 F.2d at 1580. Moreover, the *Industrial Fasteners* court interpreted Congress' "merchandise exported" to apply to the "exported articles" in that case. Finally, the GATT provision that is incorporated by the statute speaks of like products, not like product sectors.

In sum, the language of the statute on its face, as well as the guidance from the Federal Circuit appear to direct Commerce to require a tight fit between the rebate and tax incidence, and the product at issue. However, the driving reason behind this requirement in the statute, and in *Industrial Fasteners,* was to ensure the accuracy of the determination of whether the rebate exceeds the tax incidence or not. Commerce claims that the method employed in *Antifriction Bearings,* which looked to the specific merchandise, is *less* accurate than its current method.

In announcing its decision to change its methodology in *Butt–Weld Pipe Fittings,* Commerce stated:

> [For our final determination] we divided the tax incidence on all items physically incorporated into all products classified in the secondary steel products sector, which includes carbon steel butt-weld pipe fittings, by the value of all domestically-produced finished goods in this sector. Given that the aggregated data used in the I/O study is broken down only by sector, and that each sector covers many individual products, *it is impossible to isolate the value of domestically-produced pipe fittings.* Although the methodology described above is a deviation from that used in previous investigations involving products from Thailand (see, for example [*Antifriction Bearings* ]), *we believe that it more accurately reflects that amount of the allowable rebate.* In previous investigations we divided the tax incidence on all items physically incorporated in the subject merchandise only by the value of all domestically-produced finished goods in the sector to which the subject merchandise belongs, an apples-to-oranges comparison. In the present investigation we divided the tax incidence on all items physically incorporated in the sector by the value of all domestically-produced finished goods in the sector, a sector-to-sector, or apples-to-apples, comparison.

*Butt–Weld Pipe Fittings,* 55 Fed.Reg. 1698 (emphasis supplied by defendant). The Court is leery of pat analogies because they are so susceptible to manipulation. In the example above, Commerce shifted from an "apples-to-oranges" (or merchandise-to-sector) comparison to an "oranges-to-oranges" (sector-to-sector) comparison, not an "apples-to-apples" comparison as Commerce claimed. Therefore, ostensibly, Commerce has moved away from, rather than closer to, the merchandise specific correlation intended by the statute to obtain this desired uniformity. The mere fact that the method in *Antifriction Bearings* was flawed does not mean that Commerce's new methodology is permissible—even though it may be more accurate than the previous methodology.

Commerce responded as follows to the petitioner's objection to this change in methodology:

> Petitioner argues that the law requires us to calculate the allowable rebate for the [Tax Certificates program] based on the tax incidence on items physically incorpo-

rated in the exported product only. Petitioner advocates the [*sic*] we return to our practice [followed in *Antifriction Bearings*].

Respondents counter that the law does not specify at what level of disaggregation the physical incorporation test must be performed, thereby allowing us to use the tax incidence on items physically incorporated in the entire secondary steel sector as a surrogate for the tax incidence on items physically incorporated in the subject merchandise.

*DOC Position*

The I/O study is structured on a sectoral basis and, therefore, *it is impossible to isolate the indirect tax incidence attributable solely to the subject merchandise.* Accordingly, we have determined that it is appropriate to use the tax incidence on all items physically incorporated into the secondary steel sector products to calculate the amount of allowable rebate of indirect taxes under this program.

55 Fed.Reg. 1700 (Comment 3) (emphasis supplied by defendant). While the Court is sympathetic to Commerce's dilemma, Commerce need not accept imperfect data, or data that is impossible to reconcile with its statutory mandate. On the contrary, Commerce usually rejects such data, and the reduction from the tariff calculation that the data supports, absent other information by which Commerce can verify party's submissions. To do otherwise oppugns the well-established principle that the party under investigation should not be permitted to control the record by submitting insufficient, inaccurate, or inappropriate data. *See Saha Thai Steel Pipe Co. v. United States,* —— CIT ——, 828 F.Supp. 57, 63 (July 15, 1993) (and cases cited therein). Therefore, the mere fact that it was impossible for Commerce to obtain information on the specific merchandise is no justification, by itself, for accepting the sector-to-sector comparison.

Under the traditional *Chevron* analysis, the Court must first decide whether the statute at issue is clear. If the statute is clear, the Court and the Commerce Department must give effect to the statute. The Court concludes, from the discussion above, that the statute is clear only in that it requires a reasonable link between the subsidy program and the product for which a remission or rebate has been granted.

The statute does not clearly set out what methodology the Commerce Department must employ to assess or verify this relationship between subsidy and product. As discussed above, Commerce has broad discretion to choose a methodology to satisfy the statutory mandate. Commerce has argued that its new methodology is more accurate than that utilized in *Antifriction Bearings*—even though the Court has observed that the *Antifriction Bearings* methodology reflects a more literal approach to fulfilling the statutory mandate.[20] Plaintiff has not substantially rebutted this contention, even though it has established to the satisfaction of the Court that the new methodology is clearly susceptible to error.[21]

While this issue has never been addressed by this Court, the Court has been permissive of Commerce's chosen methodology regarding similar problems in antidumping reviews. In *Far East Machinery Co., Ltd. v. United States,* 12 CIT 972, 699 F.Supp. 309 (1988) (*"Far East II"*), this Court found that a Taiwanese manufacturer demonstrated sufficient links between duties paid in Taiwan on steel coil suitable for incorporation into exported pipe to warrant adjustment to United States price for drawback of duties. *See also, Far East Machinery Co., Ltd. v. United States,* 12 CIT 428, 688 F.Supp. 610 (1988) (*"Far East I"*) (initial remand instructing Commerce to consider additional information). In *Far East II,* the Court held that:

Based on the record in this case, ... the court cannot hold that ITA erred in finding the linkage requirement satisfied by a system which allows some latitude in match-

---

**20.** The Commerce Department apparently thought so as well, as evidenced by its initial selection of the *Antifriction* methodology to approach this problem.

**21.** *See supra, n. 7 & n. 8.*

ing of specifications of imports and exports, in an industry where various sizes and types of pipe are made by the same manufacturers.

*Far East II,* 12 CIT at 977, 699 F.Supp. at 313.

In *Far East I,* the Court recognized the difficulty, if not impossibility, of determining with absolute certainty some of the figures needed for the complex antidumping calculations. *See Far East I,* 12 CIT at 431, 688 F.Supp. at 612. In that case, Commerce applied "substitution principles" to facilitate its task. *See id.*

In upholding the ITA's acceptance of Taiwan's somewhat loose linkage test, the *Far East* Court relied in part on the record and in part on a series of administrative determinations which stood for the proposition that Commerce was required merely to establish a "reasonable link" between duties imposed and rebated. *See Far East II,* 12 CIT at 975–77, 699 F.Supp. at 312–313; *Far East I,* 12 CIT at 431–32, 688 F.Supp. at 612; *see also, Acrylic Film, Strips and Sheets, at Least 0.030 Inch in Thickness from Taiwan,* 49 Fed.Reg. 10,968, 10,972 (Mar. 23, 1984); *Bicycles from Taiwan,* 48 Fed.Reg. 31,688, 31,689–90.

Just as this Court found the reasonable linkage standard reasonable in connecting duties imposed and rebated in an antidumping investigation, the Court finds in this case that Commerce reasonably established a link between the remission of duties and carbon steel pipe and tube by applying a sector-by-sector analysis where adequate information did not exist for a product-by-product analysis and where Commerce had found that the sector disaggregation reliably reflected the rebates in the past.[22]

### 3. *Adjustments to Input/Output Table*

Plaintiff argues alternatively that if the Court does allow the I/O tables to be used in a sector-to-sector analysis by the Depart-

ment, the Court should compel Commerce to modify its sector approach for clear inaccuracies.[23] First, Wheatland argues that because no sector 105 products are used in the production of pipe and tube, Commerce must remove the tax incidence attributable to all sector 105 products. *Plaintiff's Brief at 14–15.* This tax figure would be removed from the numerator of Commerce's calculation of allowable rebate based on the Thai I/O tables.

Commerce responds that it did consider this modification methodology but chose not to follow it based on the same reasons for which it was discarded in *Butt-weld Pipe Fittings. See Defendant's Brief at 24–26.* Commerce argues that it would be creating a larger inaccuracy by curing the flaw pointed out by Wheatland Tube because Commerce has no way of isolating from the value of domestic production figures for each respective sector (the denominator in the allowable rate calculation) the amount which represents only the subject merchandise.

Second, Wheatland notes that the only significant physically incorporated input is hot-rolled coil—all of which was imported for the purposes of this review, and that domestic taxes are only imposed upon three physically incorporated inputs—none of which are sector 105 products. Thus, Wheatland argues that failing to remove the value for domestic tax incidence on all sector 105 products from the value for tax incidence on sector 106 products results in a "double benefit" to pipe and tube producers:

> Imported coil incurs no domestic business tax—it only incurs import duties and taxes which are rebated under the duty drawback program or the "A" rate.... In addition to getting the benefit of either the "A" rate or duty draw back, they get credit for domestic taxes paid by producers of other sector 106 products on sector 105 inputs used to produce those other products.

22. "The methodology used in completing the I/O table has repeatedly been evaluated and approved by the Department in numerous countervailing duty determinations involving products from Thailand." 56 Fed.Reg. 25,407 (Comment 1).

23. See discussion of I/O inputs, *supra,* at n. 7 & n. 8 and accompanying text.

... The GOT had already provided Commerce with information on the amount of business taxes imposed on non-ferrous metal (107), plastic wares (098), and paints, varnishes and lacquers (087). Questionnaire Response at Exhibit 8, A.R. 14. The uncontroverted evidence demonstrates that these are the only inputs in the I/O Table that are physically incorporated into the subject merchandise and on which domestic business taxes are imposed. Therefore, if Commerce were to use the I/O Table, it should have calculated the total indirect tax incidence for the subject pipe and tube as the sum of the taxes on those three input categories, divided by the FOB value of all sales of sector 106 products.[ ]

*Plaintiff's Brief at 14–15.*

Again, Commerce counters that Wheatland's argument "suffers from the fact that it is impossible to isolate the value of pipe and tube production from the total production value for all sector 106 products.... Moreover, Wheatland would have Commerce perform an even less accurate comparison, as Wheatland has further reduced the value of the numerator by including only domestically produced inputs, despite the fact that the denominator would include the value of production for products produced with both domestic and imported products." *Defendant's Brief at 26.* However, as defendant points out, even plaintiff concedes that the information necessary to make these adjustments is not available. *See Id. at 26 n. 14, citing Plaintiff's Brief at 15 n. 38* ("Ideally, of course, the rate for standard pipe would be determined by using product-specific tax totals and value totals, but the GOT Sector 106 study did not provide such data.").

Wheatland argues, finally, that the Court should remand this issue with instructions that Commerce resort to BIA if the Thai respondents cannot supply figures isolating the value of pipe and tube production from the total production value for all sector 106 products. Commerce, however, has made it abundantly clear that it has already analyzed the various facts (and lack thereof) and methodologies to arrive at the most accurate approach to assessing the excess rebates in the GOT Tax Certificate Program—a program which has achieved a satisfactory level of accuracy continuously in the past. Therefore, a remand with instructions to rely on best information available would be frivolous.

Commerce does not directly dispute the merits of Wheatland's claims. Rather, Commerce insists that overall, its methodology is more accurate. The Court cannot conclude, based on the record before it, that the Department of Commerce did not act reasonably in choosing the more accurate of the two imperfect methodologies.

*Conclusion*

The Department of Commerce's methodology for determining the actual amount rebated by the Thai government on carbon steel pipe and tube is not perfect, nor is it perfectly accurate. The Department's methodology, based on the Court's review of the record, was a reasonable way to proceed based on the information at the Department's disposal and has a satisfactory record of reliability. Plaintiff has not proposed a satisfactory alternative to substitute for or correct the Department's methodology. Therefore, the decision of the International Trade Administration, Department of Commerce is affirmed.

**JUDGMENT**

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; it is hereby

**ORDERED, ADJUDGED,** and **DECREED:** that plaintiff's motion is denied; it is further

**ORDERED, ADJUDGED,** and **DECREED:** that the determination of the Department of Commerce, International Trade Administration in *Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand, Final Results of Countervailing Duty Administrative Review,* 56 Fed.Reg. 50,852 (Oct. 9, 1991) is sustained in all respects; and it is further

**ORDERED, ADJUDGED,** and **DECREED:** that this action be and the same hereby is dismissed.